UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-cr-00599-RBW |
| DONNIE DUANE WREN | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Donnie Duane Wren to 51 months' imprisonment and $35,000 as well as $2,000 in restitution and the mandatory assessment of $100 for each felony conviction and $25 for each Class A misdemeanor.   The guidelines range as calculated by the government and the Probation Office is 46 to 57 months' imprisonment, and a fine of $20,000 to $200,000 so this would be in the mid-range for imprisonment, as is appropriate in this case.

I.      INTRODUCTION

The defendant, Donnie Duane Wren, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million

1

dollars in losses.[1]

On January 5, 2021, Wren joined his cousin and co-defendant, Thomas Harlan Smith, on a 10-hour drive from Alabama to Washington, D.C.   After attending the rally held by former President Trump on the morning of January 6, 2021, Wren proceeded to the United States Capitol where he remained for over two hours, witnessing violence against officers defending the Capitol and eventually assaulting a line of police officers attempting to clear the Upper West Terrace so that the electoral certification could continue.   The unimpeached video evidence presented at trial showed that Wren did this by pushing on a riot shield held by an officer to protect himself. Wren pushed against the riot shield to slow the officers down as they tried to clear the area. Unaware of that video evidence of his conduct, he lied to FBI agents following his arrest, claiming that he had been pushed into officers.   He then doubled down on that lie when he testified falsely at trial that he "had put [his] hand up to catch [him]self" on the shield (Trial Tr. 4/28/23 at 98:21-23).   Even after the jury said otherwise, Wren claimed on social media that he was wrongfully convicted. He also claimed that an FBI agent lied in a warrant application in this case.   To date, he has shown absolutely no remorse for this criminal conduct on January 6.

The government recommends that the Court sentence Wren to 51 months' incarceration

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

for his convictions of 18 U.S.C. § 111(a), which is within the advisory Guidelines' range of 46-57 months, the range that the government submits is the correct Guidelines calculation.   A 50-month sentence reflects the gravity of Wren's conduct, including his willingness to take the stand and defend his actions before a jury—telling multiple versions of his reasons for pushing on the police shield as new evidence emerged.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

As the government established at trial, the January 6, 2021 attack on the United States Capitol by hundreds of rioters was an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Wren's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Wren participated in the January 6 attack on the Capitol.   His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department, open-source video, surveillance footage from inside of the Capitol, and photos and videos taken by himself and his co-defendant and cousin, Thomas Harlan Smith.

Wren traveled to Washington, D.C. from his home in Alabama on January 5.   He and his cousin first made their way to the former President's rally and thereafter marched to the U.S. Capitol.



*Image 5:An image recovered from Wren's phone, showing him proudly marching with Smith towards the U.S. Capitol on January 6, 2021.*

### Wren Climbed the Scaffolding to the Lower West Terrace

By approximately 2:40pm, Wren had entered Capitol Grounds.   (Tr. 4/28/2023 at 154:23
– 155:8.)   Wren then approached the scaffolding leading up to the Lower West Terrace.   Wren
climbed up scaffolding being used to construct the inaugural stage—and paused to take a photo of
the scaffolding before climbing it.   He admitted at trial that the scaffolding seemed "dangerous
because of the way it kept swaying."   (Tr. 4/28/2023 at 146: 10-16.)



*Image 6: An image recovered from Wren's phone, after he climbed the scaffolding to reach the Lower West Terrace of the United States Capitol.*

Wren chose to climb up the scaffolding anyway and proceeded from there to the mouth of the Lower West Terrace tunnel (the "Tunnel"). Despite repeatedly claiming that he did not see any signs nor hear any indication that he was not supposed to be on the U.S. Capitol (Tr. 4/28/2023 at 89:25 – 90:17), Wren witnessed violence directed by other rioters against police officers at and in Tunnel.   He heard people shouting at the mouth of the Tunnel "we need real men in here," (Tr. 4/28/2023 at 132:2-5), admitted to looking into the mouth of the tunnel in his FBI interview and

at trial (Tr. 4/28/2023 at 126:21-127:14), and would have witnessed the violence occurring in the Tunnel.

He then was reunited with his cousin, who had just emerged from the Tunnel; the two posed for a photo together on the Lower West Terrace.   Wren's cousin Smith had been sprayed with something in the Tunnel and that his face was red and irritated.   (Tr. 4/28/2023 at 130:10 – 131:18.)   Still, Wren did not leave.



*Image 7: Photo taken by Wren of Wren and Smith on the Lower West Terrace, after Smith emerged from the Tunnel*

### Wren Assaulted a Police Officer on the Upper West Terrace

Wren then climbed up a railing to the Upper West Terrace (the "Terrace").   He remained there for approximately 35 minutes and paraded back and forth in front of lines of officers waving his flag.   At 4:20 p.m., as police officers dressed in riot gear, helmets, and shields clearly marked POLICE, Wren moved quickly to the front of the rioters to confront the police, who had created a wall of shields and were advancing to clear the Terrace.   Wren pushed back against the police line, placing two hands on an officer's shield for about 20 seconds.   (Trial Exs. 330-332.)



7

*Image 8: Photo of Wren and Smith pushing against the line of officers on the Upper West Terrace*

Wren leaned all his weight into the riot shield, preventing the police officer from advancing in his attempt to clear the Terrace of rioters.  Wren's push against the riot shield was an early assault on the Terrace that instigated the fight between rioters and police who were attempting to clear the Terrace.  According to Corporal Robert Heaney of Prince George's County, who testified at trial, Wren and Smith were part of the initial resistance by rioters on the Terrace as officers attempted to clear the area.  Corporal Heaney testified that he remembered Wren specifically—and that Wren's push on the police riot shield "was the closest to me, kind of first, you know, aggressive contact going on between us and the rioters."  (Tr. 4/21/2023 at 26:12-22.) He also noted that this point in time, when Wren and Smith were pushing back against officers at 4:21 pm, was "a point where they dug in and started pushing back against the wall [of officers], and that's when the fighting pretty much kicked off."  (Tr. 4/21/2023 at 19:1-16.)

Wren eventually retreated, but he did not leave the Terrace for another ten to 15 minutes. Based on video and photographic evidence, Wren trespassed on Capitol grounds for over two hours.  During that time, police officers were still attempting to clear the Capitol so that the electoral certification could continue.  Wren's efforts to occupy a restricted area and to actively resist officers trying to clear the area was a significant component of the rioters' assault on the police in that location on that day.

### Wren's False Statements

During his initial interview with the FBI, when confronted with photos showing his hands on a police shield, Wren provided materially false information by telling the FBI that he was

8

pushed into the police line. (Tr. 4/28/23 at 118:14-21.)   Before giving this "someone pushed me" explanation, Wren had asked the FBI several times whether they had any video in addition to the photos.   (Tr. 4/28/23 at 116:3-6; Tr. 4/28/23 at 117:15-17.)   At the time of the interview, the FBI did not show him any video, and the video used at trial to show Wren's conduct pushing on the shield for 20 seconds did not come to the government's attention until it was tweeted during the trial.   The false explanation that he was "pushed" into an officer given by Wren to the FBI was an attempt to obstruct or impede the investigation, and Wren maintained this falsehood while testifying until he was confronted with additional video evidence.

Wren testified that: "I put my hand up to catch myself.   And I actually, honestly thought I was pushed into the police." (Tr. 4/28/23 at 98:21-23.)   This material falsehood was made clear during trial once videos of the push became available, and Wren saw them for the first time.   (Tr. 4/28/23 at 118:9-13.)   After opening statements, on the second day of trial, two videos making the 20 second timing of the push clearer were tweeted and made available to the government—who immediately turned them over to defense and sought to enter them into the record.   Once the newly acquired video made it clear that no one pushed him, Wren changed his story.   (Tr. 4/28/23 at 118:14-21.)   He admitted that it didn't look like anyone pushed him but maintained that he felt like he was pushed.   (Tr. 4/28/23 at 119:20-23; see U.S.S.G. § 3C1.1 n.4(B)).

Furthermore, Wren attempted to obstruct by selectively recalling portions of former President Trump's speech. After testifying to specific portions of Trump's speech during direct examination, Wren claimed he did not hear Trump talk about how the election was stolen (Tr. 4/28/23 at 140:18-25); and that he did not hear Trump speak about the election being fraudulent

(Tr. 4/28/23 at 141:1-3); but he remembered Trump saying to go down to the Capitol "peacefully" (Tr. 4/28/23 at 141:15-17).   After testifying that he remembered select portions of the speech made by former President Trump on January 6, 2021, but no mention of the fraudulent election, Wren was again confronted with evidence—this time a video of the rally he took on his phone (Trial Ex. 611)—showing that he once again was not telling the whole truth on the stand.   In this video, Wren did hear the former President claim the election was stolen and fraudulent.

### *Wren's Post-Trial Statements*

After the trial, Wren posted statements to a Give Send Go account online, requesting $25,000 (as of October 3, 2023, $0 has been raised so far).   In support of his request Wren writes:

> My name is Donnie Wren. I live in Athens, Alabama and I am a fellow patriot who attended the rally in Washington DC on January 6th. I have been wrongfully charged with 2 felony charges; assaulting, impeding, or resisting officer's and entering and remaining in a restricted building or ground; and 1 misdemeanor; civil disorder. I never went inside the Capitol, **nor did I physically touch, in any manner, a officer or anything to that nature.**
> **During my trial it was proven that the FBI agent lied to get my arrest warrant.** I was arrested on my job in Miami, Florida on October 6, 2021 then bonded out putting my house up for my bond. I had 14 felony charges but found guilty on 2 with 1 misdemeanor as stated above. This day, January 6, was supposed to be a peaceful day that turned into my worst nightmare. Not only for me but for my family as well. I have 2 boys and 2 grandchildren that I love dearly and love spending time with. My dad has passed and my mom is just horrified, as well as my kids and I, of me going to prison. I'm a Christian, a peaceful person and a patriot.
> **On January 6 I witnessed things by the police that horrified me. The same police that are supposed to protect us we're brutality beating and killing our fellow patriots. In the brutality of their actions 4 of our fellow patriots we killed unnecessarily. I ended up in a pushing match with the police because I was trying to help protect fellow patriots from being trampled and beaten on.** I have no criminal record before this. I'm a simple family man and a extremely hard worker.
> I have to return to Washington DC for my sentencing on August 17th. I am asking for your help so I can return for my sentencing and for my appeal. I have already spent all of my savings and put everything I own up for attorney fees and my stay during the court process. My funds are gone and I could use some help from my fellow patriots. These funds will be used strictly for my appeals process including my legal defense and my travels to and from DC for court. That me praying I don't go to prison. I want to say thank you in advance for anything and everything you do to help me and please keep my family and I in your prayers. They a greatly needed.

(Emphasis added).

Not only does this statement by Wren deny his culpability by saying he "did not physically touch, in any manner, a[n] officer or anything like that," he makes a bold and dangerous false statement that "[d]uring my trial it was proven that the FBI Agent lied to get my arrest warrant"—making it seem that he is the victim here somehow being unfairly targeted by the federal government.[2]   Most egregiously, Wren goes on to describe the police "brutality [sic] beating and killing our fellow patriots" and that he only "ended up in a pushing match" with police to protect others, again minimizing his culpability and seemingly blaming the police for protecting the U.S. Capitol.

### III.   THE CHARGES AND GUILTY VERDICT

On May 5, 2023, a jury returned a verdict of guilty on three of the seven counts against Donnie Wren:

- Count Two, Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count Four, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1); and

- Count Seven, Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1).

The jury acquitted Wren of four misdemeanor counts:

- Count Eight, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2);

- Count Nine, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4);

- Count Thirteen, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

---

[2] Note that it is not clear to the government what testimony or evidence this statement is referencing to.

- Count Fourteen, Act of Physical Violence in the Capitol Grounds or Buildings, 40 § U.S.C. 5104(e)(2)(F).

## IV.    STATUTORY PENALTIES

Wren now faces sentencing on each of Counts Two, Four, and Seven.

As noted by the Presentence Report issued by the U.S. Probation Office, Wren faces up to:

- For Count Two (18 U.S.C. § 231(a)(3)):   five years imprisonment, a fine of up to $250,000, and a mandatory special assessment of $100.

- For Count Four (18 U.S.C. § 111(a)(1)):   eight years imprisonment, a fine of up to $250,000, and a mandatory special assessment of $100.

- For Count 7 (18 U.S.C. § 1752(a)(1)):   one year imprisonment, a fine of up to $100,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Government agrees with the calculation in the Final Presentence Report.  That Guidelines analysis follows:

12

Count Group 1: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 | Victim Related Adjustment | +6 |
| U.S.S.G. § 3C1.1 | Adjustment for Obstruction of Justice | +2 |
| | **Total** | **22** |

The PSR correctly concludes that because the Counts group, Count Two, which has the higher base offense level, provides the base offense level for the grouped Counts. *See* PSR ¶ 39-56.

The U.S. Probation Office calculated Wren's criminal history as Category II; however, the defense argues it should be Category I. PSR ¶ 57-61; *see* Defense objection on pg. 32. The government agrees with Probation's determination. Paragraphs 59 and 60 accurately explain why each of the convictions referenced in those paragraphs generated one criminal history point, resulting in a criminal history category of II. The government further agrees that the Probation Officer's response to the defense objection, set forth on page 32 of the PSR, accurately explains why defense counsel's objection to Probation's calculation of Wren's criminal history category is meritless.  Defense's objection that that "in the state of Alabama a conviction for trespass is analogous to a traffic ticket" is not persuasive.  *See* Defense objection on pg. 32; U.S.S.G. § 4A1.2(c)(1)(B).  Under 4A1.2(c)(1)(B), the trespass conviction is counted if "the prior offense was similar to an instant offense."  Here, the prior offense occurred when it was made clear to Wren that he had been trespassed and was not allowed on the property of his ex-wife.  PSR ¶ 59. There was an officer there waiting for him when he arrived, despite being advised not to come because it would be criminal trespass.  Wren admitted he knew he was trespassed from the

property and was arrested. PSR ¶ 59.   Though the events of January 6, 2021 go far beyond criminal trespass, the common element of knowing one is not allowed to be somewhere, but going there anyway, is certainly present in both instances.   Accordingly, based on the government's calculation of Wren's total adjusted offense level at 22, and a criminal history as Category II, Wren's Guidelines imprisonment range is 46 to 57 months' imprisonment. The United States requests that the Court find at sentencing that it would impose the same sentence under the § 3553(a) factors regardless of its rulings on any disputed guidelines issues.

**Count Two: 18 U.S.C. § 231(a)(3)--Obstructing Officers During a Civil Disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   U.S.S.G. § 2X5.1.   Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." |
| | | Wren made physical contact with an officer when he placed his hands on an officer's riot shield, and leaned all of his weight into the shield, preventing the officer from advancing.   Physical contact need not be direct and encompasses indirect uses of force. *See, e.g., United States v. Taliaferro,* 211 F.3d 412, 415-16 (7th Cir. 2000) (specific offense characteristics properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton,* 431 F. Supp. 2d 675, 675-77 (E.D. Texas 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd,* 230 F. App'x 457 (5th Cir. 2007). Courts have even held that the specific offense characteristic applied to a defendant |

| | | |
|---|---|---|
| | | who worked in concert with a codefendant who made indirect contact with a victim. *See United States v. Beltran-Higuera¸*642 F. App'x 780, 782-84 (9th Cir. 2016). |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." <br><br> The Application Notes to Section 2A2.2 define "aggravated assault" as a "a felonious assault that involved … (D) an intent to commit another felony."  U.S.S.G. § 2A2.2 cmt. n.1. <br><br> The Guidelines do not define "assault" or "felonious assault."  Sentencing courts have looked to the common law to define "assault" for Guidelines purposes.  *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010).  Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another.  *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). <br><br> Here, Wren's pushing against the police line constituted assault.  Furthermore, the assault constituted a felonious assault because the assault involved physical contact.   *See* 18 U.S.C. § 111(a)(2) (punishing § 111 assaults as felonies where the assault involved physical contact).   Alternatively, the |

| | | |
|---|---|---|
| | | assault constituted a felonious assault because it involved the intent to commit another felony, i.e., Civil Disorder under Section 231(a)(3).  *See* 18 U.S.C. § 111(a)(2) (punishing § 111 assaults as felonies where the assault involved the intent to commit another felony).   Wren's assault on police was directly related to his participation in and support of the civil disorder. This is made explicit by his admission that he pushed against the line "to slow it down," thereby preventing the officers from clearing the rioters from the Terrace.   Because the felonious assault was committed with the intent to commit another felony, i.e., to obstruct officers during the civil disorder, the assault also constituted an aggravated assault pursuant to U.S.S.G. § 2A2.2 cmt. n.1(D). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) (Aggravated Assault) |
| Chapter 3 Adjustment | +6 | U.S.S.G.   §   3A1.2(a),(b):   "the   victim   was   a government   officer   or   employee,   the   offense   of conviction   was   motivated   by   such   status,   and   the applicable   Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> The officers in the line who Wren pushed against were from Prince George's County. They wore uniforms, riot   gear,   and   carried   shields   clearly   marked "POLICE." Wren admitted that his goal in pushing against the police line was to slow them down in performing their duties of clearing the Terrace and defending the Capitol. Thus, he was motivated by their status as police officers. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |

| | | |
|---|---|---|
| | | Wren provided materially false testimony under oath when he claimed that "[I] put my hand up to catch myself. And I actually, honestly thought I was pushed into the police." Tr. 4/28/23 at 98:21-23; *See* U.S.S.G. § 3C1.1 n.4(B). |
| Total | 22 | |

**Count Four: 18 U.S.C. § 111(a)(1)—Assaulting, Resisting, or Impeding Certain Officers**

The Statutory Index references two guidelines for 18 U.S.C. §111, U.S.S.G. §§ 2A2.2 (Aggravated Assault) and 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction.   See § 1B1.2 n.1. here, the most applicable guideline is § 2A2.4 (Obstructing or Impeding Officers).

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." <br><br> *See* analysis for Count Two, above. |
| Cross Reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault). <br><br> *See* analysis for Count Two, above. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Official Victim | +6 | U.S.S.G. § 3A1.2(a),(b) <br><br> *See* the analysis for Count Two, above. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |

|  |  | See above. |
|---|---|---|
| Total | 22 |  |

**Count Seven: 18 U.S.C. § 1752(a)(1)—Entering and Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting.   *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | See below | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>Wren admitted that he remained in the restricted area of the Capitol complex for the purpose of assaulting, resisting, or impeding officers who attempted to clear the area. He knew he "shouldn't have been there." Thus, the substantive offense is Count Four. |
| Base Offense Level | 14 (from Count Four) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Accordingly, the guideline for the substantive offense, Count Four, should be applied.   As discussed above, the appropriate guideline for Count Four is U.S.S.G. § 2A2.2. The base offense level in U.S.S.G. § 2A2.2(a) is 14. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See* above. |
| Total | 16 | |

Under U.S.S.G. § 3D1.2, "closely related counts" group.   Counts Two and Four ("Group A"), charging violations of 18 U.S.C. §§ 231(a) and 111(a), group under U.S.S.G. §3D1.2(b) because they involve the same victim – Prince George's County officers – and they also involve similar acts "connected by a common criminal objective" – assault and obstruction of police. Pursuant to U.S.S.G § 3D1.3(a), when counts group together under USSG § 3D1.2(a), (b) or (c) the offense level for that group is the same as that for the "most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group."   Here, the highest offense level for Group A is 22.   Accordingly, the offense level for Group A is 22.

Count Seven ("Group B"), charging a violation of 18 U.S.C. § 1752(a)(1), does not group with the other two counts because it has a separate, distinct victim: Congress.   For Group B, the highest offense level is 16.   Accordingly, pursuant to U.S.S.G. § 3D1.3(a), Group B's offense level is 16.

Under U.S.S.G. § 3D1.4(a) "the Group with the highest level" counts as "one Unit," and under U.S.S.G. § 3D.14(b), "any Group that is 5 to 8 levels less serious than the Group with the highest offense level" "count[s] as one-half Unit."   Accordingly, Group A (offense level 22) counts as one unit and Group B (offense level 16) counts as an additional one-half unit, for a total of 1 ½ units.   Under the table set out in U.S.S.G. § 3D1.4, when there are 1 ½ units then the Combined Offense Level for all the groups is one level higher than the offense level applicable to the Group with the highest offense level.   Here Group A, with an offense level of 22, is the group with the highest offense level.   Accordingly, the additional one level results in a Combined Offense Level for the two groups of 23.

### VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

#### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Donnie Duane Wren's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Wren trespassed by climbing scaffolding, remaining on the steps of the Capitol despite seeing that Smith had been sprayed during the violence in the Tunnel, then climbing up to the Upper West Terrace and pushing against an officer's shield for 20 seconds, which kicked off a violent stand-off between officers and the remaining rioters.   He then lied to the FBI and repeated that false account in his trial testimony.     The nature and circumstances of Wren's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 51 months.

#### B.   Wren's History and Characteristics

Wren has a history of arrest and conviction for similar conduct (including criminal trespass) that he has repeated despite convictions, which weighs in favor of incarceration:

- Wren criminally trespassed on March 21, 2010, and failed to appear despite a warrant being issued.   The warrant was later executed on January 12, 2013, and Wren pled guilty to criminal trespass.   (PSR ¶ 59)

- Wren has also pled guilty to Driving Under the Influence in Tennessee on January 25, 2012, and was sentenced to 11 months and 29 days in county jail (of which 48 was served) and had his driving privilege suspended for one year.   (PSR ¶ 60) However, on November 25, 2012, Wren was caught speeding despite having his

21

license at the time revoked for the DUI.   Wren was arrested and taken to Rhea County Jail in Tennessee.   (PSR ¶ 65)

C.      **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Wren's criminal conduct on January 6 was the epitome of disrespect for the law.

D.      **The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Wren's prior convictions for trespassing and DUI shows that this was not his first encounter with the criminal justice system.

Second, Wren's statements online after January 6 and his false trial testimony were those of a man who was proud of his actions that day.   During the trial itself, Wren stated:   "I got

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

22

arrested for something I didn't believe I should get arrested for."   (Tr. 4/28/2023 at 106:16-17.) Far from realizing that his conduct was serious, Wren went on to make false statements about the search warrant being based on lies by the FBI and the police action that day after he was found guilty by a jury of his peers.

These statements show that Wren is not remorseful for his actions.   Instead, he feels justified in what he did, and he wants to paint this trial against him and his cousin as a witch hunt by the federal government.   It is not.

This demonstrates that Wren is deserving of a substantial prison sentence that is sufficient to provide specific deterrence from committing future crimes like this one, particularly in light of his history of trespass and his failure to acknowledge of the gravity of his actions against police.

E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Like in *United States v. Aiden Henry Bilyard* (No. 1:22-CR-34), Wren lied to FBI officers during his interview and downplayed his participation in the events on January 6, 2021.   Wren also spent time on the Lower West Terrace like *Bilyard*, and though his attack against officers took place on the Upper West Terrace the conviction of 18 U.S.C. § 111(a) is reflective of his behavior. Unlike Bilyard, who took a plea—Wren took the stand and doubled-down on some of his false statements to the FBI.   This Court sentenced Aiden Henry Bilyard to 40 months' incarceration.

Wren's conduct also has parallels to *United States v. William Watson* (No. 1:21-CR-513). Like Watson, Wren climbed the scaffolding to get to the Lower West Terrace and joined the mob efforts there and on the Upper West Terrace.   Though Wren did not necessarily verbally encourage others as Watson did, nor enter the building, Wren's conduct was arguably more egregious as he took on officers physically by pushing on the police shields as they attempted to clear the Upper West Terrace.   This was a clear effort to advance the crowd and, as Corporal Robert Heaney testified, sparked additional violence encouraging other rioters to violently resist rather than leave the area.   Again, Watson pled guilty and showed some acceptance of responsibility for his actions that day—Wren has yet to show sincere remorse or responsibility.

26

This Court imposed 36 months' incarceration, 36 months supervised release, $12,000 restitution, and a $200 assessment to the Court.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. §3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property ... including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Wren was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall"

impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because Wren engaged in criminal conduct in tandem with  hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

   More specifically, the Court should require Wren to pay $2,000 in restitution for his convictions on Counts Two and Four.   This amount fairly reflects Wren's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

   For the reasons set forth above, the government recommends that the Court impose a

sentence of 51 months' imprisonment and $35,000 as well as $2,000 in restitution and the

mandatory assessment of $100 for each felony conviction and $25 for each Class A misdemeanor.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     */s/ Victoria A. Sheets*
        VICTORIA A. SHEETS
        Assistant United States Attorney
        NY Bar No. 5548623
        601 D Street NW
        District of Columbia, DC 20530
        (202) 252-7566
        victoria.sheets@usdoj.gov

30