```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,       .
                                      .  Case Number 21-cr-599-1
 4              Plaintiff,            .
                                      .
 5         vs.                        .
                                      .  Washington, D.C.
 6    DONNIE DUANE WREN,              .  October 16, 2023
                                      .  1:19 p.m.
 7              Defendant.            .
      - - - - - - - - - - - - - - - -

 8

 9                 TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE REGGIE B. WALTON
10                    UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the United States:       TIGHE BEACH, AUSA
                                   VICTORIA SHEETS, AUSA
13                                 United States Attorney's Office
                                   601 D Street Northwest
14                                 Washington, D.C. 20579

15    For the Defendant:          GEORGE PALLAS, ESQ.
                                   George T. Pallas, P.A.
16                                 2420 Coral Way
                                   Miami, Florida 33145
17
                                   DYLAN BARKET, ESQ.
18                                 Barket Lawyers
                                   66 West Flagler Street
19                                 Seventh Floor
                                   Miami, Florida 33130
20

21    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  Good afternoon, Your Honor.  This is Criminal Matter 21-599-1, United States of America versus Donnie Duane Wren.

May I have the parties approach the lectern and state your appearance for the record, beginning with the government.

MR. BEACH:  Yes, Your Honor.  Tighe Beach for the United States.  We will be joined by Victoria Sheets shortly.

And I greatly apologize for our tardiness this afternoon. I got mixed up on the time between 2:00 and 1:00, but I'm very sorry.

THE COURT:  I'll forgive you this time, but never again.

MR. BEACH:  Thank you, Your Honor.

MR. PALLAS:  Good afternoon, Your Honor.  The always prompt George Pallas on behalf of Donnie Wren, assisted by Dylan Barket.  And Mr. Wren is seated -- or standing now at counsel table.

Good to see you again, Your Honor.

THE COURT:  Good afternoon.

I guess the first thing we need to address is the government's submission that wasn't made timely, it was filed today, in reference to the government's request to have a victim impact statement filed under seal.

1       And I guess my question to government counsel is, why does

2    the document need to be filed under seal?  It's normally -- what

3    the Court considers in assessing what the appropriate sentence

4    is is something that should be available for public consumption,

5    but I will hear from you as to why you think it should be under

6    seal.

7        MR. BEACH:  Your Honor, I don't think there's anything

8    specific in this impact statement that requires that it be filed

9    under seal.  We were advised that we can and should file it that

10    way.  But if that was bad advice, then I agree, it seems like

11    victim impact statements can be in the record.

12        THE COURT:  At most, what I would be willing to do

13    would be to conceal the identity of the writer, because

14    unfortunately in these cases, not only have we as judges been

15    threatened, but also I know witnesses have been threatened.  I

16    know from prior hearings that police officers who have spoken

17    out in reference to what has occurred that day have been subject

18    to threats.

19       So if there's a concern about the identity of the officer,

20    I would have no problems -- I guess I will hear from defense in

21    reference to that, but I have no problems, I think, placing the

22    name under seal.

23        MR. BEACH:  That was our concern and the purpose of

24    the motion, Your Honor.  So if the Court is willing to limit the

25    seal to redaction of the name, we would ask for that.

1      Thank you.

2              THE COURT:  Any response to that?

3              MR. PALLAS:  Judge, as far as the sealing, we have no

4      position as to that.

5              THE COURT:  Very well.  Then I will order that the

6      name of the officer who submitted the victim impact statement be

7      under seal.  Government counsel will need to file an amended

8      order consistent with that.

9              MR. BEACH:  Yes, Your Honor.  Thank you.

10             THE COURT:  This matter here is for sentencing.  In

11     preparation for the sentencing, I did review the second

12     superseding indictment, also the verdict form, also the motion

13     for a judgment of acquittal, which we will address obviously

14     before we proceed to sentencing, also the government's response

15     to the motion for judgment of acquittal, and also the defense

16     motion for a new trial, and also the government's response to

17     that motion.

18         Is there anything else I should have reviewed in

19     preparation for sentencing, government counsel?

20             MR. BEACH:  Other than the exhibits that are

21     attachments, no, Your Honor.

22             THE COURT:  I did review those today.

23         Anything else from the defense that I should have reviewed

24     other than what I indicated?

25             MR. PALLAS:  There was a defense objection to the PSI

1    and --

2                THE COURT:  We will get to that.

3                MR. PALLAS:  Other than that, nothing, Your Honor.

4                THE COURT:  Very well.  We need to deal with the

5    motions first before we proceed to sentencing.  There was a

6    motion for judgment of acquittal, which previously I have ruled

7    on, but I will hear from counsel as to why that motion should be

8    granted.

9                MR. PALLAS:  Judge, there was one other item, the

10   notice of supplemental authority that I filed regarding the

11   Third Circuit decision in U.S. v. Washington.

12               THE COURT:  I don't believe I saw that.  What is that

13   about?

14               MR. PALLAS:  Judge, that's exactly the situation we

15   have here.

16        What happened in that case, in Philadelphia, there's a

17   Social Security office, which is a federal government office,

18   and the Federal Protective Service, the federal law enforcement

19   agency, contracts out with a private security company to provide

20   security services for that Social Security building.

21        A Social Security recipient was told to come file some

22   document there, and he came down there that day to do that and

23   was told that because of COVID you have to leave it in the

24   Dropbox.  He said, look, I was told to come here personally.

25        So of course, a situation ensued, and a -- the defendant,

1    the recipient, Social Security recipient, then became the

2    defendant by assaulting those security guards.  He was indicted

3    and tried for violation of 18 U.S.C. 111, just like defendant

4    Wren was, and just like the motion for judgment of acquittal

5    that I raised.

6         And he was convicted at trial, appealed.  The Third Circuit

7    said no, that those guards do not fall within the statute

8    18 U.S.C. 111 and also 18 U.S.C. 1114, which expands the federal

9    officer.

10        And basically, the Court said -- and this is what I have

11   been saying until I was blue in the face, Judge.

12             THE COURT:  And you will probably get bluer, but go

13   ahead.

14             MR. PALLAS:  I will, Judge.  I don't stop, Judge.  I'm

15   sorry.  When I see -- I'm here to fight for justice for my

16   client, and I think it's an injustice that he's convicted of

17   that offense, because this Third Circuit decision says basically

18   that yes, a federal officer can enlist people to help them in an

19   assault situation, and if the defendant assaults that person

20   that's being enlisted, that can give rise to a prosecution under

21   111.

22        But in that situation where there was a contract between

23   the Federal Protective Services and the security guards, and

24   they actually had to swear an oath, that that was not enough,

25   because they didn't show that they were enlisted or they were

1    called to be there to assist the federal officer.

2         For example, I'm a federal officer.  You're assaulting me.

3    I go, Mr. Barket, help me, help me defend, and you then assault

4    Mr. Barket.  That would be a 111 against me and against him.

5         But in this case, we have a situation where we don't even

6    know who this person is, first of all.  It's someone dressed --

7              THE COURT:  Come on, Counsel.  We know that these were

8    police officers from Prince George's County, or if they weren't

9    from Prince George's County, they were from the Metropolitan

10   Police Department.

11             MR. PALLAS:  Judge, I deal with facts in evidence.  I

12   don't know the face of that person.  I don't know if it's a male

13   or a female.  I don't know who it is.  I don't know when they

14   were sworn in as an officer, whether their certification as an

15   officer is valid.  It was all hands on deck.  I don't know who

16   that person was.

17        Yes, was he wearing a Prince George County uniform?  Yeah,

18   he was.  Did -- I mean, I find it hard to believe -- I find it

19   hard to believe that this Officer Heaney, who just did this

20   victim impact panel --

21             THE COURT:  And Counsel, you've just violated my

22   sealing order.  I indicated that the officer's name would not be

23   made public because of the threats that have been made against

24   law enforcement officials as a result of the events on

25   January 6.

1           MR. PALLAS:  I apologize, Your Honor.

2       The officer that filed the victim impact panel says in his

3   victim impact panel -- victim impact statement that he was mere

4   feet away.  Yet, he doesn't know who his fellow officer is?  I

5   mean, I have a problem with that, Judge.  They come up on a bus.

6   They're all together.  They don't know each other, and he

7   doesn't know who he claims he was a few feet from?

8       But in any event, so we don't really know.  I mean, we can

9   assume.  We can circumstantially assume that it is an officer.

10  But we don't know.

11      And certainly, there's nothing to say that that person was

12  called to help -- there's no proof of that.  There's no proof of

13  any type of mutual aid agreement that governments, municipal

14  governments, state governments, district court -- District of

15  Columbia government enter into, because when there is -- when

16  you're using police officers outside their jurisdiction, there's

17  all kinds of issues.  There's issues of worker's compensation,

18  chain of command.  What if they're injured on the job?  There's

19  all kinds of things.  And there was nothing to show.  There's no

20  government proof of that.

21      And because of that and because of -- more importantly,

22  because of the Third Circuit decision that was just this August,

23  I believe, that the government failed to prove the essential

24  element of the 111 offense, and the acquittal should be entered.

25          THE COURT:  Government.

1          MR. BEACH:  Your Honor, the evidence in this case is

2     clear that the officer was carrying a shield that said "police"

3     on it.  He was wearing the P.G. County uniform and body armor.

4     The identity is really not in dispute.

5          Even if it were, this whole thing out of the Third Circuit

6     is not binding here, and even if it were, that is a completely

7     different context, because it's a private contractor, as defense

8     counsel points out, in a pretty normal situation:  Protecting

9     the doors of a federal building not during a riot.

10          This is January 6, 2021.  This is the Capitol building.

11          THE COURT:  And I'm going to look at the opinion.

12     It's being brought to me now.  But in that situation, were these

13     security guards called to an emergency to provide assistance to

14     law enforcement officials?

15          MR. BEACH:  Not as far as I understand it, Your Honor,

16     no.  I believe it's a contract to assist with security on a

17     normal daily basis.  Whereas, this is an all hands on deck, as

18     defense counsel put it, call for aid in an emergency.  So

19     there's no time to draw up contracts, and it would be

20     unrealistic for the Court to hold that as the standard here.

21     These people were obviously assisting the Capitol Police during

22     the most infamous riot in American history.

23          So the Court should deny the motion.

24          THE COURT:  I'll take a short break.

25          (Recess taken from 1:32 p.m. to 1:38 p.m.)

1          THE COURT:  Okay.  For several reasons, I would

2     conclude that the Third Circuit opinion, which is not binding

3     authority on the Court but is persuasive authority, does not

4     provide support for the position being taken by counsel for

5     Mr. Wren.

6          First of all, the officers in that Third Circuit case up in

7     Philadelphia were private security guards and not sworn members

8     of a police department.

9          And the Court specifically made note of the fact that the

10    argument that the government was making on appeal that these

11    security officers were assisting law enforcement officials,

12    federal law enforcement officials, had been waived by the

13    government because below the government had not taken the

14    position that the security officers were providing assistance to

15    federal officers.  And therefore, the Court concluded that the

16    government could not on appeal take a different position because

17    that would amount to a constructive amendment of the indictment,

18    because the indictment did not specifically indicate that the

19    security officers were in fact assisting federal law enforcement

20    officials.

21         So counsel is wrong when counsel says that the Third

22    Circuit case is directly on point.  And here, the indictment

23    specifically said that the officers who were assaulted were

24    either federal law enforcement officers, members of the

25    Metropolitan Police Department, or other law enforcement

1    agencies, and therefore, the indictment did encompass other

2    officers of any other law enforcement entity that was providing

3    assistance to the government on that occasion.

4         So contrary to what defense counsel says, that case does

5    not support the proposition for which it's being presented, and

6    I would conclude that in light of the fact that the indictment

7    does say that the charge dealt with individuals who had provided

8    assistance to federal law enforcement officials, and here,

9    despite what counsel says, I think it's clear that the officers

10   who were assisting, who the government says were assaulted, were

11   in fact Prince George's County police officers, and those were

12   specifically encompassed in the indictment.

13        And accordingly, I would conclude that the Third Circuit

14   case does not provide any support whatsoever for the position

15   taken by the defense, and accordingly, in reference to that

16   particular argument, that will be rejected.

17        Next argument.

18        MR. PALLAS:  Yes, Judge.  The next argument is the

19   inconsistency of the verdicts, Your Honor.  And I understand

20   under Supreme Court case law that it's very difficult to disturb

21   a jury's verdicts, plural, even when they are inconsistent.

22        But in this case, as Your Honor well knows, this was a

23   well-litigated case, and we had a lot of back and forth

24   regarding jury instructions.  And the jury instructions that

25   were requested and some of the pretrial motions actually caused

1  a confusion which then rendered the inconsistency of the

2  verdict.

3      And there was a case I did cite that says that if there are

4  improper jury instructions, that then a court will overturn --

5          THE COURT:  How were the instructions in some way as

6  it relates to this issue that you're raising confusing to the

7  jury?

8          MR. PALLAS:  Well, Judge, I requested many

9  modifications to the jury instructions that Your Honor denied,

10  one of which was the specific unanimity of the elements of

11  18 U.S.C. 111.  One of them was the argument about how the 111

12  and the 231, which, you know, 111 requires the intent to commit

13  another felony, and that the government used the 18 U.S.C. 231

14  civil disorder in Count 2 as the -- that other felony, even

15  when -- even when the grand jury and the indictment

16  specifically -- and we're referring back to the indictment,

17  specifically stated that they both occurred at the same exact

18  time.  So how could it then be another felony when it's the same

19  conduct?  And that was a big problem with the 111 count.

20      And then the jury comes back, and they find the defendant,

21  this defendant, not guilty --

22          THE COURT:  But you can commit two offenses or

23  multiple offenses at the same time.  For example, you can seek

24  to rob somebody, and during the course of the robbery, you kill

25  them, and you can, therefore, be convicted of both the robbery

1   and the murder.

2           MR. PALLAS:  But, Judge, you can be -- there's a case

3   law actually on point where you can enter a bank to commit a

4   felony and then commit a robbery in there, and then when you

5   commit that robbery, you can no longer be found guilty of the

6   intent to commit the felony.  So --

7           THE COURT:  I don't understand that.  I mean, if you

8   go into a bank to commit a robbery of the bank and during the

9   course of that you rob somebody else who is a customer in the

10  bank, you can be convicted of both the robbery of the bank and

11  the robbery of the customer.

12          MR. PALLAS:  Correct.  But if you enter a bank to

13  commit a felony and the only felony is the robbery, then you can

14  only be found guilty of the bank robbery and not the intent

15  to -- we had this discussion during the trial, Judge.

16          THE COURT:  I just don't buy it.  Number 1, as you,

17  you know, candidly admit, the Supreme Court, which I don't have

18  any authority to overrule their decisions, has said that juries

19  can be inconsistent, and they provide a host of reasons why that

20  may be the case.  And if a jury is inconsistent, that's no basis

21  for throwing out the convictions.

22          But coupled with that, the statutes, in my view, do in fact

23  require different proof in order to establish violations of the

24  several statutes.

25          So I don't, number 1, find that there are any

inconsistencies in reference to the verdict, but even assuming

for the sake of argument that the verdicts are inconsistent,

Supreme Court authority tells me that I have no authority to

throw out the convictions.

MR. PALLAS:  Understood.

THE COURT:  So I will reject that argument also.

Next argument.

MR. PALLAS:  That's it for the motion for judgment of

acquittal, but I do have the motion for new trial.

THE COURT:  Yes.  You may.

MR. PALLAS:  Judge, one of the grounds for a new trial

that I filed was the failure to grant my pretrial motion to

sever the defendants.  As we learned during the trial, there was

one defendant that was much more involved, much more active at

the Capitol, on Capitol grounds that day, and there was

Mr. Wren, who was a lot less active and was charged with a lot

less offenses and was convicted of a lot less offenses.

And the failure to sever the defendants, as Your Honor will

recall, caused a host of problems during the trial, one of which

was the problem of Mr. Wren's ability to effectively

cross-examine the agent that took his statement.  We had a big

problem about that.  I was limited in the amount of

cross-examination I could do.

THE COURT:  Refresh my memory as to what you're

referencing.

1          MR. PALLAS:  Okay.  What happened was two defendants.

2    Mr. Wren gave a statement; Mr. Smith did not.  The government

3    called the agent, the FBI agent from Miami who took Mr. Wren's

4    statement.  And Your Honor entered an order limiting only two

5    areas of inquiry of that agent.

6        And then as you may recall, the agent who they called who

7    had done the majority of the questioning for that statement left

8    the room shortly and another agent was still there.  There were

9    two agents present.  One left to go call for prison transport.

10   The other agent continued conversing with the defendant, and

11   there were contrary statements made then that we weren't able to

12   get into because of the limiting on the cross-examination of the

13   defendant -- of the agent.

14          THE COURT:  But as I understand, if we're talking

15   about the same situation, we're talking about statements that

16   were made about over an hour apart from each other.

17          MR. PALLAS:  In the same statement.

18          THE COURT:  But about an hour apart from each other?

19          MR. PALLAS:  Yeah, probably.  I don't recall exactly,

20   but it was later in the statement.  Early on in the statement,

21   he said one thing; later in the same statement, sitting in the

22   same seat in the same room in the same recorded statement, said

23   something different.

24       Whatever time it was, you know, that -- I don't recall, but

25   that Sixth Amendment, I say, violation, my inability to

1    effectively cross-examine that defendant -- I mean that agent,

2    based upon your protection of --

3         THE COURT:  As I recall, we're talking about him

4    having made an inculpatory statement while the one officer --

5    while both officers, I guess it was, were present.  And then the

6    one officer leaves, and according to my memory, it's about an

7    hour or more between the two statements that a second statement

8    is made that's exculpatory.

9         MR. PALLAS:  Yes.  Your memory is correct, Judge.  I

10   don't know exactly the time, but yeah, it was much later.  It

11   was towards the end, because they were calling for the prison

12   transport, they were going to take him into custody, absolutely.

13        But that was all because of the severance, Judge.  I was --

14   you limited me only into two areas to cross-examine that agent.

15        THE COURT:  And the reason for that was because,

16   obviously -- I mean, if we were talking about the two statements

17   having been made close in time to each other or almost

18   simultaneously, that would be a different situation, but

19   obviously -- I'm sure counsel is appreciative of the fact that

20   inculpatory statements made by a defendant are in fact

21   admissible as an exception to the hearsay rule.  However,

22   exculpatory statements made by a defendant are not admissible as

23   hearsay.

24        And under certain circumstances, I could see how, again, if

25   you're talking about statements almost being made

1   simultaneously, that even though the otherwise inadmissible

2   exculpatory statement would not come into evidence, that under

3   certain circumstances, it might.  But I don't see that as the

4   case here, because as I say, you're talking about over an hour,

5   as I understand, maybe shortly over an hour difference between

6   when the two statements were made.

7        And the government also points out, and I will hear from

8   government counsel on this, because the government states in its

9   reply that there were two different locations that were being

10  referenced in reference to those statements.

11       But in any event, even if that were not the case, I just

12  don't see how a exculpatory statement made about an hour after

13  an inculpatory statement somehow makes that exculpatory

14  statement admissible, despite the fact that it's otherwise

15  inadmissible hearsay.

16            MR. PALLAS:  Well, the rule of completeness, Rule 106

17  does.

18            THE COURT:  Again, I think it's the same thing.

19  Again, if you're talking about the two sort of being connected

20  because of time, then I would agree with you.  But if somebody

21  makes an inculpatory statement and then they have an hour or so

22  to think about it and change their position and say something

23  different, I don't think the rule of completeness applies.

24            MR. PALLAS:  Well, it wasn't exactly -- whatever time

25  period it was, if it was even an hour, he wasn't there thinking

1    about it.  He was there being questioned by these officers

2    and --

3            THE COURT:  I don't know if that's the case or not.  I

4    mean, I think if somebody has said something and then they have

5    some time to think about it, they may change what their position

6    is.  And I think under those circumstances, the rule of

7    completeness doesn't apply because of what I indicated, where

8    the law has made a determination that an inculpatory statement

9    made by a defendant is in fact an exception to the hearsay rule

10   but an exculpatory statement made by a defendant is not.

11           MR. PALLAS:  That's true, except when there's -- when

12   you need to have completeness out of fairness of what the

13   statement was as a whole.

14           THE COURT:  If I'm wrong, the Court of Appeals will

15   tell me.  But I think that would really change the landscape

16   regarding how you consider statements made by a defendant if

17   someone can make an inculpatory statement, there's an hour or so

18   that passes in time, and subsequently they change their position

19   and make exculpatory statement, that somehow that makes that

20   otherwise inadmissible hearsay statement admissible.

21       I just don't think that's the law and should not be the

22   law.  And therefore, I would have to conclude that the previous

23   rulings that I made were in fact correct, and I'm not prepared

24   to change that position.  If the Court of Appeals wants to see

25   otherwise, that's the way the system works.

1          MR. PALLAS:  That was just one part of the severance.

2     The other severance part was just the overwhelming evidence

3     against the defendant Smith that spilled over onto Mr. Wren.

4     And Your Honor recalls the dozens of tweets and Facebook posts

5     and memes and items that were introduced about, you know, we

6     stormed the Capitol, we beat their asses, we did this, we did

7     that.

8          Your Honor did try to attempt to cure some of that.  But

9     then when it came -- when Mr. Smith did testify, they went back

10    to it.  It was just overwhelming stuff.

11         As you recall, Mr. Wren had absolutely no presence on

12    social media concerning January 6.

13         So that was also a part of the severance motion.

14         THE COURT:  I would agree that the quantum of evidence

15    against Mr. Smith was greater than the evidence against

16    Mr. Wren.  However, I don't conclude, based upon case authority,

17    that the disparity was so significant that that alone would have

18    been a sufficient reason to grant severance.  The law does, in

19    fact, favor that cases be tried collectively rather than

20    individually, absent circumstances where prejudice would inure

21    to one defendant as compared to the other because of the

22    difference in the quantity of evidence against the two

23    individuals.

24         And I don't find that distinction to be of significance

25    here, coupled with the fact that the jury's verdict itself, I

1    think, is indicative of the fact that the jury in fact followed

2    my instructions and did in fact consider separately the evidence

3    that applied individually to each defendant, which is why they

4    found Mr. Smith guilty of everything and found your client

5    guilty of only about one-half of the charges he had been filed

6    with.

7         I think that alone shows that the jury did scrutinize the

8    evidence, consider it separately, and did not, in fact, consider

9    evidence that was admissible against Mr. Smith as evidence that

10   indicated your client's culpability.

11            MR. PALLAS:  Understood, Judge.

12            THE COURT:  Very well.

13            MR. PALLAS:  The other points I raised in my motion

14   for a new trial, one of them is also the --

15            THE COURT:  Go ahead.  I'm listening.

16            MR. PALLAS:  -- the duplicity and confusion regarding

17   111(a) and 231(a), which we've discussed in the motion for new

18   trial, about how they -- how one is a lesser offense, they

19   merge, and it was very confusing for the jury.  And I also

20   mentioned the rule of completeness, which Your Honor has

21   expressed his feelings about or his decision on how he would

22   approach that.

23        Finally, Judge, I have the jury selection, the problems

24   with the jury selection that occurred.  As you might recall, the

25   first four challenges by the government, 75 percent of them were

African-American.  And I raised a *Batson* challenge.  Your Honor

overruled my *Batson* challenge.  But I believe that was error.

THE COURT:  Only after I heard from the government and

the government articulated a neutral reason for its position,

and the Supreme Court in *Batson* did say that yes, the government

cannot strike individuals based upon their race or gender, but

that doesn't end the Court's inquiry, that when there's a

challenge made on those grounds, the Court then has to query the

government as to whether it provides an explanation for why it

took the position it did.

And the government did that, and I was of the view, based

upon what they said, that there was good reason why they were

exercising their strikes against those jurors that had nothing

to do with their skin color.

MR. PALLAS:  The other issue about juror selection,

Judge, was the striking of a prospective juror simply because he

was unvaccinated.  This was April of this year.  We had begun

the trial shortly after President Biden signed the bipartisan

congressional resolution ending the COVID-19 national emergency.

That was April 11th.  I think we began April 5th -- I'm sorry,

April 17th, I believe we started.  So this was five or six days

beforehand.

And then we came down to the point where there were two

females who were variantly anti-unvaccinated, and they refused

to sit on a jury with anyone that was not vaccinated.  And Your

1     Honor struck the unvaccinated person and allowed the other two

2     to remain.  And I had to then use peremptory challenges to

3     strike those jurors.

4          THE COURT:  Well, as the Fourth Circuit ruled, because

5     it addressed a similar argument, that there was good reason, the

6     Fourth Circuit said, to strike jurors who were not vaccinated

7     because of potential problems that their presence as a member of

8     the jury could create, in light of the fact that although in

9     reference to this case the president may have lifted the

10    emergency related to the virus, nonetheless, people are being

11    infected now.

12         And the fact that if we had let somebody sit on this jury

13    who was not vaccinated, obviously, they could infect other

14    people.  That could have resulted in a mistrial.  And

15    consequently, we would have had to start the trial all over

16    again.

17         I mean, this issue hasn't been addressed specifically by

18    this circuit.  Maybe this will give them the opportunity to do

19    that, if there is a challenge made.  But I do conclude that

20    under the circumstances, it was totally appropriate to conclude

21    that because there were several jurors who did express concern

22    about having to sit as jurors with individuals who were not

23    vaccinated, understandably -- and the jury room's a small

24    location.  People are sitting in close proximity to each other.

25    And I think it would be unconscionable to require that people

1   serve with individuals who, for whatever reason, did not want to

2   vaccinate themselves and therefore would be a potential health

3   risk to those who were.

4       So I understand your position, but I just think it was an

5   appropriate decision to make in order for us to be able to try a

6   case during a time when, although the emergency may have been

7   lifted, that there still was a significant infection problem

8   that was causing people to become positive for the virus.

9       MR. PALLAS:  Finally, Judge, the last striking of an

10   otherwise qualified juror was the one that -- one woman that had

11   peacefully demonstrated at the Capitol, and she was removed for

12   no other reason other than the fact that she was at the Capitol

13   that day.

14       THE COURT:  And I also struck individuals who said

15   things about living near the Capitol also, because I concluded

16   that they were too close to the event and therefore would

17   conceivably be adversely affected by it and consequently

18   concluded that those individuals should not serve either.

19       MR. PALLAS:  Okay.

20       THE COURT:  Very well.  I'll note all of those

21   objections for the record.

22       MR. PALLAS:  Thank you, Judge.

23       THE COURT:  Okay.  In reference to the presentence

24   investigation report, are there any objections that we need to

25   deal with that were not resolved by Probation?  Government?

1          MR. BEACH:  No, Your Honor.  Thank you.

2          THE COURT:  Defense?

3          MR. PALLAS:  Yes, Judge.  There was some factual

4    assertions that were agreed to, I believe, by the Probation

5    Office, but there were some legal issues that were not.

6          THE COURT:  Okay.

7          MR. PALLAS:  The applicable guideline, the offense

8    level computation, it's a tricky guideline provision.  111 has a

9    base offense level; 18 U.S.C. 231 does not.  But then

10   essentially, when they find that there's a 111 -- a conviction

11   on 111 and that the person assaulted an officer, it's then added

12   a six-point increase if it's an aggravated assault.

13        And the problem in this case -- and Your Honor knows it,

14   because Your Honor saw everything, and Your Honor listened

15   attentively.  111 can be violated or a person can be convicted

16   under 111 without ever committing assault.  They can just impede

17   or obstruct.

18        And I think Your Honor saw that and I think the jury saw

19   that by acquitting the defendant of engaging in violence on the

20   Capitol.  And I think that all that occurred in this case was an

21   obstruction or an impeding of the police officer or the police

22   shield line.

23        So the question then becomes, how then could a -- something

24   that's not an assault jump to become an aggravated assault?  And

25   it just can't.

1          THE COURT:  Let me hear from the government.  I will

2     let you respond.  Let me hear from the government on this.

3          MR. PALLAS:  Sure.

4          THE COURT:  Government counsel, what do you say in

5     response to this argument?  Because while, obviously, there was

6     a pushing by Mr. Wren against the police shield and maybe

7     technically -- I don't know if an argument can be made that that

8     amounted to an assault.  But clearly, the statute permitted

9     conviction of the charge even though -- even if there wasn't

10    assault, if there was an obstruction or impeding of the police

11    officer's conduct.

12         What's your response to defense counsel's position that

13    there was no assault, and therefore, these increased numbers

14    under the guidelines should not apply?

15         MS. SHEETS:  Yes, Your Honor.

16         First, we would note that the jury did convict of an

17    assault, 111(a), and that the language in the jury instructions

18    was clear.  Factually, we point out -- and this evidence was

19    presented to the jury as well through Corporal Heaney -- that

20    the push on the police shield --

21         THE COURT:  And you're referencing which count?

22         MS. SHEETS:  This would be Count 4, the 111(a).

23         THE COURT:  The instruction to the jury was, as far as

24    the first element, that the defendant assaulted, resisted,

25    opposed, impeded, intimidated, or interfered with an officer of

1    the Capitol Police, Metropolitan Police, or some other police

2    agency.

3              MS. SHEETS:  Yes, Your Honor.  Let me correct myself.

4    I didn't mean to imply that the word "aggravated" was there,

5    just that in 111(a) the jury did convict on assault or

6    interfering with an officer.

7              THE COURT:  But if it's not clear, considering the

8    instruction that was given -- and I don't specifically remember

9    a request that some type of unanimity requirement be imposed.

10   But in any event, if it's not clear that the jury convicted of

11   the assault as compared to the impeding or obstructing, then how

12   can the assault aspect of the guidelines apply?

13             MS. SHEETS:  One moment.

14        (Government counsel conferred.)

15             MS. SHEETS:  Yes, Your Honor.  We understand the

16   argument a little better now.

17        I would point the Court to the evidence in this case, just

18   stepping away from the jury's instructions, that this particular

19   push was one that involved physical contact and one that, as we

20   heard Corporal Heaney testify, kicked off a lot of the violent

21   resistance that was happening on the Upper West Terrace.

22        So in this case, it's not like a lot of things were already

23   happening and a defendant happened to put their hands up and

24   that that's what happened.  We heard testimony that the officers

25   were attempting to clear the Upper West Terrace and that in

particular this defendant was remembered by the witness,
remembered his hair, identified him in court, and noted -- and
he was one of the officers on that line who submitted a victim
impact statement.  He remembers specifically that that action of
pushing the police shield being the thing that really riled
everyone up and started to kick off the resistance, if you will.

That became very, very violent, much further beyond --

THE COURT:  But does that qualify as an assault?

MS. SHEETS:  We would argue that it does and that it
meets the aggravated assault.

THE COURT:  And query -- even if it does, if there was
not an instruction given to the jury for the jury to indicate
that they found that there was an assault committed as compared
to an obstruction or an impeding, then would it be appropriate
to conclude that they found that there was an assault?

MS. SHEETS:  Our position is it would be appropriate
to apply the guidelines, which is not an exact answer to your
question, but I can --

THE COURT:  I have some concerns about that, because
it seems to me that, you know, when we're talking about criminal
law and we're talking about the punishment of maybe taking
somebody's liberty away, that statutes -- and that would
include, I would conclude, the guidelines -- have to be
construed strictly, and I do have concerns about concluding --
considering the predicate for which the jury could have found

culpability, concluding that they did find that an assault had
been committed based upon the evidence that was presented during
the case.

Because yes, I think it's conceivable that pushing at
somebody or pushing on a shield can be an assault.  But I think
an argument could be made that it did not amount to an assault,
and therefore, the predicate for the conviction was based on the
other alternatives other than the assaultive conduct.

MS. SHEETS:  Yes, Your Honor.  Understood.

THE COURT:  Let me just ask Probation, if I were to
agree with the defense position that there was no assault and,
therefore, that particular aspect of the guideline would not
apply, what would the guideline be?

PROBATION OFFICER:  Your Honor, it's Probation's
understanding that we're talking about 2A2.2 not even applying,
correct, and that the Court is --

THE COURT:  Yes.

PROBATION OFFICER:  -- going to apply the 2A2.4, the
impeding an --

THE COURT:  As I understand, that is the argument.

MR. PALLAS:  10 would be the base offense level
instead of 14.

PROBATION OFFICER:  Your Honor, Probation stands on
the arguments that it made on page 31 of the presentence report
in reference to why it believes that 2A2.2 applies to this

1    offense.

2        Not to get into the argument of per the statute what an

3    assault is or per the law what an assault is, the Probation

4    Office is relying on specifically what the guidelines say.  And

5    I believe it's in Application Note -- Court's indulgence.

6        THE COURT:  So we're talking about 2A which one?  I've

7    got to read the application note.

8        PROBATION OFFICER:  2A2.2.  And reference is made, I

9    believe, in the presentence report to a footnote, footnote 2.

10   But essentially, the comment says in note 1 that a, quote,

11   aggravated assault, end quote, is a felonious assault that

12   involves several factors, to include intent to commit another

13   felony.

14       In this case, the defendant's conduct constituted

15   aggravated assault in that the conduct in this count was

16   committed during his intent to commit another felony, namely the

17   conduct in Count 4, resisting, assaulting, or impeding officers.

18       While the Probation Office agrees with defense counsel that

19   if using 2A2.4, the adjustment in the U.S. guidelines 3A1.2 is

20   not applicable, for the reasons stated above, the Probation

21   Office contends with -- the use of 2A2.2 is the appropriate

22   guideline to apply.

23       The Court, obviously, being there for the trial is in the

24   best posture to note whether guidelines under 3C1.1 note 4

25   apply, whether he conducted himself in an obstructive manner in

that content, but as far as the applicable guideline per the
guidelines definition of what an aggravated assault is, the
Probation Office stands on the presentence report and that that
applies.

THE COURT:  Okay.  Anything else from the government?

I think I would on this issue agree with the defense
regarding what the applicable guideline should be and,
therefore, would -- but I will hear from government counsel if
you want to argue otherwise.

MS. SHEETS:  Very briefly, Your Honor.

I would just note that if, it sounds like, Your Honor is
inclined to apply 2A2.4, that the base offense level of 10 would
be increased by 3, because under 2A2.4(b)(1) there's a
three-level increase for an offense involving physical contact.

THE COURT:  Mr. Pallas, do you want to respond to
that?

MR. PALLAS:  I'm losing track of my calculations here,
Judge, which is the reason why I became a lawyer.

But the base offense level would be 10, I do agree, and
that's what it would be, instead of the 14.

THE COURT:  Very well.  I would agree with that and
would request that Probation recalculate what the guideline
would be, with the base offense level being 10 as compared to
14.

MR. BEACH:  Your Honor, when you asked about issues

```
 1    with Probation's report, I didn't realize we wanted to get into
 2    guideline analysis.  If you would like to get into that for
 3    Mr. Smith now --
 4              THE COURT:  No, we'll do that separately.
 5              MR. BEACH:  Thank you.
 6              THE COURT:  Anything else on objections to the report
 7    other than what we've dealt with already?
 8              MR. PALLAS:  Yes, Judge.  I set them forth there in my
 9    objections.  I also on the victim-related adjustment, where
10    they -- it's not applied pursuant to 2A2.2.  Therefore, the
11    victim-related adjustment of six levels is not added.
12         And they also added adjustment for a role in the offense,
13    and Your Honor, I'm sure, is fully familiar with leader,
14    organizer, and no adjustment, and then minor role and minimal
15    role.
16         I asked for and I submit the evidence supports a minor
17    role.  The role here compared to the two defendants -- and of
18    course, now we have a defendant that was the former president of
19    the United States.  So his role's much higher certainly than
20    Donnie Wren's.  He's a defendant in a January 6 case.
21         But in any event, I think just looking at the two cases --
22    and Your Honor did say the quantum of evidence is completely --
23              THE COURT:  But I don't normally do a comparison
24    between the two of them in assessing whether he's entitled to a
25    reduction based upon a minimal or minor role.  That's not the
```

1     standard that I apply in deciding whether that diminished

2     application applies.

3             MR. PALLAS:  Judge, it's the amount of involvement in

4     the offense.

5             THE COURT:  I think I have to consider the overall

6     circumstances and not just compare his conduct as compared to

7     the co-defendant.

8             MR. PALLAS:  Well, I mean, that's how you do it,

9     Judge, isn't it?

10            THE COURT:  No, you consider in the context of what he

11    did, not a comparison to what somebody else did, in deciding

12    whether he's entitled to a diminished role involvement.

13            MR. PALLAS:  But if there's criminal conduct by two

14    defendants on the same date and the same instance and one

15    defendant commits far more offenses and one is less involved and

16    less present on social media and did not have the truck to drive

17    up here with and did not round up people to come, I mean --

18            THE COURT:  But that doesn't make his involvement

19    minimal in the overall context of what was taking place that

20    day.  That's what I think I have to consider, not as compared to

21    the involvement of his co-defendant.

22            MR. PALLAS:  Well, then if you're going to consider

23    all participants in January 6, you have to consider people that

24    went into the Capitol.  You have to -- which this defendant did

25    not.  You have to consider people that broke things, which this

1       defendant did not.  You have to consider people that threw

2       things at the police.

3               THE COURT:  But there were people who went in who did

4       nothing but go in.  I'm not saying that that is not a

5       significant event, considering what occurred that day.  But I

6       would consider their involvement less than your client's

7       involvement, where he's in the tunnel involved in that

8       altercation that took place in the tunnel, and then he comes out

9       and seems to be congratulatory about what had taken place and

10      goes to another location and then sees the police moving forward

11      and should have understood that they were trying to remove

12      people from that area of the Capitol, and then he goes up to the

13      shield and starts to push against the shield.

14          I mean, that's significant conduct, and I don't see how

15      under those circumstances I can conclude that his role was

16      minimal in any degree.

17              MR. PALLAS:  Judge, he never went into the tunnel.  He

18      was at the face of the tunnel.  He looked in the tunnel, and he

19      turned away, and he left.  And I think that's important, because

20      he didn't even go in.  And there were people -- and the

21      government put in their sentencing memorandum, there were people

22      saying, we need more men, we need more men.

23              THE COURT:  But he saw what was taking place, Counsel,

24      and I think if somebody had a minimal role, that when they saw

25      that taking place and all the violence that was occurring, they

1    would say, I'm going out of here and would have turned away and

2    left.  He didn't.  He went to another location.  He saw the

3    police again obviously seeking to remove people and then

4    encountered the police and tried to stop them from doing what

5    they were doing.

6         MR. PALLAS:  He left that location, the tunnel, and he

7    followed his cousin up to the Upper West Terrace.  And you see

8    in the video where the cousin is moving ahead, and Mr. Wren is

9    behind following.  He did -- was involved in that encounter with

10   the shield.  But he within seconds left.  He left and went up to

11   that portico, as you recall, and the crowd was getting more

12   nasty and more violent and everything.  He was up there, and he

13   wasn't a part of that at all.  He retreated.

14       He didn't drive here.  It wasn't like he could just leave

15   and hop in his car and drive home.  He came up with his cousin.

16   He had to wait with his cousin.  He wasn't going to leave

17   without his cousin.

18        THE COURT:  I hear you, but you can't convince me on

19   this one that his involvement was either minor or minimal when

20   he saw what was taking place in the tunnel and the violence that

21   was occurring in that tunnel.  And then rather than just leaving

22   the Capitol, he goes to another location on the Capitol grounds

23   and then sees the police obviously trying to remove people.  And

24   rather than doing nothing or walking away, he then tries to stop

25   the police.

1    That's, in my view, not minimal or minor conduct on his

2    behalf.  So I would not be prepared to give him any credit for

3    that and reduce what his role involvement is.

4        MR. PALLAS:  Okay.  Judge, I also have the proposed

5    enhancement for obstruction of justice by false statement about

6    his testimony.

7    And I submit to Your Honor that there is nothing in the

8    testimony that obstructed justice.  On the contrary, the

9    government used his testimony against him when he said -- he

10   basically admitted that he impeded the officer.  And they blew

11   it up on their screen, and they used that.  And he admitted

12   that.

13   The only statement they really say is that he was pushed.

14   And he did say -- he did make a statement, you know, I was

15   pushed, I thought I was pushed, and then I thought --

16       THE COURT:  He didn't say "thought."  He said he was

17   pushed, which clearly was totally inconsistent with the

18   evidence.

19       MR. PALLAS:  But then he said, you know, before I saw

20   the video, I thought I was pushed, but honestly, I thought I was

21   pushed but I wasn't.

22   So that's that.  I mean, to find obstruction of justice

23   based on that, you have to be a -- you have to make boldfaced

24   lies to be obstruction of justice.  That was just a difference

25   in -- he's in the middle of a crowd.  He feels people around

him.  He felt he was pushed.  He wasn't.  He saw the video.  He honestly stated on his testimony that I thought I was pushed but the evidence shows I wasn't, and he admitted it on the stand.

So that delayed or hindered the government in presenting their case?  Not at all.

THE COURT:  I will hear from the government on this.

MS. SHEETS:  Yes, Your Honor.

It's laid out in our memo, but I will just briefly say, first of all, the false statement made to the FBI was itself obstruction when he asked three times whether they had video, and when no video was shown to him, that's when he said I was pushed.

When confronted with the video, which you'll recall the government received after opening statements and we turned over to everyone as soon as we got it, clearly showed that that was a lie, a material lie.

When confronted with it on the stand, he said, you know, I put my hand up to catch myself, which was not the full statement, as was made clear by the video.

And furthermore, you will recall Mr. Wren selectively remembered certain things and not other things.  For instance, it was brought out in testimony on cross-examination that he and Mr. Smith rode together, I think it was, about ten hours to the Capitol and that at no time did they speak about the election or the fraud, even though we saw Mr. Smith's messages and how up in

arms he was about very specific instances of voter fraud.

He also, when asked whether -- he claimed that he could not see into the tunnel and then was confronted with statements that he had previously made to the FBI that he actually could see what was in the tunnel and was forced to admit that on the stand.

And he also continually testified that he remembered former President Trump saying that the rioters were to go down to the Capitol and make their voices heard peacefully.  He said that statement several times but claimed that he did not remember anything about the election being stolen that was said, that he never heard Trump or others say anything about the electoral certification that was going to be happening.

He claimed he did not remember that and then was confronted again with video that he took showing those statements being made.

And finally, when asked whether he spoke with his cousin Mr. Smith upon Mr. Smith exiting the tunnel when Mr. Smith's face was very red, Mr. Wren -- you will recall we took a break from the jury, and Mr. Wren said yes, he did speak to him and then was very vague about what he remembered.  When asked, you know, you didn't ask you what he was sprayed in the face with, he said no, we didn't talk about it.

All of these are seemingly small, very specific instances, but I submit to the Court that it's selective recall,

1  remembering things that are helpful or he thought was helpful

2  and not remembering statements made by Mr. Smith or by former

3  President Trump or others at the rally that would hurt his case.

4          MR. PALLAS:  Can I respond, Your Honor?

5          THE COURT:  Briefly, yes.

6          MR. PALLAS:  Judge, to pick apart a defendant that has

7  a tenth grade education and try and pick apart every single

8  thing he says where these trained lawyers are tripping him up on

9  every word, you know, it's not obstruction if a person gives

10  testimony that's confusing.  It's not obstruction if his memory

11  is faulty.  It's not obstruction if it's a mistake.  It has to

12  willfully obstruct or impede the administration of justice.

13      And where was the administration of justice impeded in this

14  case?  I mean, they fully cross-examined him.  They used his

15  testimony at trial as a feature of their closing argument.

16      So apparently, he made some admissions that didn't help

17  him.  He voluntarily gave the agents his phone when he was

18  arrested.  He waived *Miranda*.  He didn't have to.  He waived

19  *Miranda* and spoke to them.  He didn't do anything to impede the

20  administration of justice, Judge, and it's just -- he said

21  something in his statement, "I shouldn't have been there."

22  Okay.  They used that statement.  Nothing false or misleading

23  about that.

24          THE COURT:  Okay.  Well, I would conclude that

25  Mr. Wren did make false statements during the investigation

1    about what his actions were on that day, and I would conclude

2    that those were not statements that were made inadvertently or

3    because of faulty memory, because I think he did willfully make

4    false statements to law enforcement authorities, and also during

5    the course of his testimony made statements that were

6    inconsistent with reality.

7        And I would conclude that the enhancement was intended to

8    cover what occurred in this case and therefore would conclude

9    that that enhancement has been appropriately applied.

10       Any other matters?

11           MR. PALLAS:  Yes, Judge.  We have the issue of the

12   criminal history category.  It's a difference between category I

13   and category II.  There is a DUI that is like ten years old, and

14   there's also a trespass, which is a --

15           THE COURT:  As I understand it, the DUI did not count,

16   did it?  It was the trespass that we're talking about.

17       Probation, is that right?

18           MR. PALLAS:  No, they counted both.

19           THE COURT:  I don't know if he got any criminal

20   history points for the DUI.

21           MR. PALLAS:  He did.  The two together put him up

22   there.  If it was only one, then, if you're not going to use the

23   DUI, then it would only be one, and then it would be criminal

24   history category I.

25           THE COURT:  Probation, what's your position?

1          PROBATION OFFICER:  Defense counsel is correct, Your

2     Honor.  Paragraph 60 is the driving under the influence out of

3     the Superior Court of Tennessee, and that was one point.  And

4     the criminal trespass out of Limestone County District Court in

5     Alabama was also one point, Your Honor.

6          THE COURT:  Thank you.

7      I understand the argument that's being made regarding the

8     criminal trespass, but I would conclude the nature of the

9     conviction in that case and the factual indication of what

10     allegedly occurred would justify the trespass conviction and

11     therefore would conclude that that appropriately applies.

12      But why wouldn't the driving under the influence apply?

13          MR. PALLAS:  No, you're the one --

14          THE COURT:  I'm asking you.  Probation says the one

15     additional point does apply, and I'm asking you why that would

16     not be the case.

17          MR. PALLAS:  Because the criminal trespass is neither

18     a felony nor a misdemeanor.  It's a violation, and it doesn't

19     qualify under the guidelines as a -- as one of those offenses

20     that could be used as a -- to determine criminal history.  If

21     you look at -- it's a infraction, which is akin to a --

22          THE COURT:  Which provision of the guidelines are you

23     referencing now?

24          MR. PALLAS:  I'm referencing 4A1.2.

25          THE COURT:  One moment.  Okay.

1        MR. PALLAS:  4A1.2(c)(1), where sentences for some

2   misdemeanor and petty offenses are counted only under certain

3   circumstances.  Trespassing is counted only if the sentence was

4   a term of probation of more than one year or a term of

5   imprisonment of at least 30 days.  That's not applicable here.

6   Or B, the prior offense was similar to an instant offense.  And

7   that's not applicable here either.  It was apparently a trespass

8   of his ex-wife's house or something, and he went in there, and

9   they issued a citation for an infraction.

10       THE COURT:  As I understand, according to the facts,

11   she told him not to come, and he went anyhow.  So it seems to me

12   that that would in fact qualify as a trespass similar to what's

13   been alleged here.

14       MR. PALLAS:  Which is what?

15       THE COURT:  That he understood or should have

16   understood, considering all that was occurring, that he was not

17   supposed to be in the location he was on January 6, and that on

18   the other occasion, he was told not to come to that location but

19   he did.

20       MR. PALLAS:  Judge, but no one told him not to go

21   to -- in fact, to the contrary, the President of the United

22   States told him to go to the Capitol.

23       THE COURT:  But when he got there, there were clear

24   signs indicating that his presence was not permitted.  And at

25   least when he realized at the tunnel what was taking place, if

he didn't realize before he wasn't welcome there, he clearly

should have understood that then.  And then when he goes up to

the next tier and he sees the police trying to remove people,

rather than walking away, he stayed there and sought to try and

impede their movement.  It seems to me that clearly qualifies as

a trespass, and he clearly should have known at that point that

his presence wasn't welcome.

MR. PALLAS:  Judge, you have -- okay.  You're talking

about Count 7, which is entering and remaining on Capitol

grounds.  That's a class A misdemeanor punishable by up to one

year.  The trespass that he had with his ex-wife was something

that was punishable not even by 30 days.  It's an infraction.

So the disparity between the severity of the infraction

versus the class A misdemeanor --

THE COURT:  But there's nothing in the guideline, is

there, that says that you look at the severity of the prior

offense in assessing whether it's similar in nature?

MR. PALLAS:  Yes, there is, actually, Judge.

THE COURT:  Where?

MR. PALLAS:  It's application note 12 to 4A1.2(c).

THE COURT:  Okay.  There are a number of factors that

have to be considered in that regard, and one of those is the

similarity, but there are other factors also.

MR. PALLAS:  Correct.  But the punishment, you asked

me, and that's what I said.

1          THE COURT:  That's one factor.

2          MR. PALLAS:  It's not even close, Judge.  It's an

3    argument between him and his wife compared to a, as the

4    government likes to say, momentous attack on democracy at the

5    Capitol.  It's quite different circumstances, Judge.

6          THE COURT:  They may be quite different, but you can't

7    convince me that trespassing in reference to a spouse who tells

8    you they don't want you present is not a serious matter.

9    Domestic violence is a major problem in our society.  And I

10   think a woman has a right to tell a man who she doesn't want to

11   be around that he's not welcome.

12         MR. PALLAS:  Right.

13         THE COURT:  And I think that's very serious conduct

14   when a man puts himself in the presence of a spouse or an

15   ex-spouse who doesn't want him to be there.

16         MR. PALLAS:  There was nothing violent about it.  It

17   was the actual trespass, and he got fines and court costs, and

18   that's all.

19         THE COURT:  I understand your argument.  If the Court

20   of Appeals sees it differently, they can reverse me.  But I

21   would conclude that the one point for the trespassing does

22   apply.

23      In reference to the DUI, I will hear from you more on that

24   one.

25         MR. PALLAS:  The DUI, I didn't challenge that.  You're

1    the one that mentioned the DUI.

2                THE COURT:  No, I'm just asking you.

3                MR. PALLAS:  I just challenged the criminal trespass.

4                THE COURT:  I would conclude that the two points,

5    then, do apply.

6         Okay.  Next matter?

7                MR. PALLAS:  As far as the guideline calculations,

8    that was it, Judge.

9                THE COURT:  Okay.  Probation, based upon the rulings

10   that I made today, can you tell me what the guideline would be?

11               PROBATION OFFICER:  Your Honor, just to be clear, the

12   Court is applying the 2A2.4, obstructing or impeding officers,

13   which has a base offense level of 10?

14               THE COURT:  That's correct.

15               PROBATION OFFICER:  As far as the specific offense

16   characteristics, is the Court finding that it's going to apply

17   (b)(1), which states the offense involved physical contact?

18   That's prong A.  Prong B of that is a dangerous weapon,

19   including a firearm, was possessed and it was used -- its use

20   was threatened, increase by three levels.

21               THE COURT:  The second would not apply; the first

22   would.

23               PROBATION OFFICER:  So the physical contact.

24               THE COURT:  Yes.

25               PROBATION OFFICER:  So that would increase it by three

1   levels.  And (b)(2), if the victim sustained bodily injury,

2   increase by two levels.

3            THE COURT:  There was no evidence of that, no.

4            PROBATION OFFICER:  Okay.  That puts it at a 13, Your

5   Honor.  And then with the enhancement under 3C1.1, that would be

6   a offense level of 15, which would put him in a criminal history

7   category of II.  So therefore, the guideline range, criminal

8   history category of II with a offense level of 15, is 21 months

9   to 27 months.

10            THE COURT:  Thank you.

11            PROBATION OFFICER:  Your Honor, just to be clear for

12   the record, does the Court wish the Probation Office to resubmit

13   another final presentence report after sentencing?

14            THE COURT:  Yes.

15            PROBATION OFFICER:  Okay.  Thank you.

16            THE COURT:  Okay.  Anything else regarding the report

17   other than what I've already ruled on?

18            MS. SHEETS:  Not from the government, Your Honor.

19            MR. PALLAS:  No, Your Honor.

20            THE COURT:  Very well.  With those rulings, I would

21   conclude that the report is, in fact, accurate and that the

22   guidelines are accurately calculated.  Consistent with the

23   rulings I made, Probation will submit a new report reflecting

24   those rulings.

25       Okay.  If there's nothing else regarding the report, I'll

```
 1    hear from government counsel regarding allocution.

 2            MS. SHEETS:  Your Honor, the government would just

 3    note with the revised calculation, that our recommendation would

 4    still be the mid-range, which would now be, I believe, 24

 5    months.

 6            THE COURT:  Thank you.

 7            MS. SHEETS:  Your Honor, I'm going to keep it very

 8    brief.  Your Honor sat through the trial --

 9            COURTROOM DEPUTY:  Excuse me, Counsel.  Are you going

10    to be using your laptop?

11            MS. SHEETS:  Yes, I am.

12            COURTROOM DEPUTY:  You can go ahead, but I have to

13    play around with it to make it show up.

14            MS. SHEETS:  Okay.  Take your time.

15       We've already gone through some of the statements that were

16    made by Mr. Wren that were materially false.

17       Let me know if I should --

18            THE COURT:  I'm listening.

19            MS. SHEETS:  So I just want to briefly go through the

20    factors.  One moment.

21       As far as the nature and circumstances of this offense, I

22    think that it cannot be overstated how impactful the events of

23    January 6, 2021, were on our country and on the officers who

24    were there that day, as Your Honor has heard in this and other

25    trials.
```

So I won't belabor that point, but suffice it to say that the interruption of the peaceful transition of power, which was impacted directly by the defendant's actions, fully support the government's revised recommended sentence of 24 months, which again is the midpoint of the newly calculated guidelines range.

As far as Mr. Wren's history and characteristics, while we certainly understand that, unlike some defendants who Your Honor sentences, there's not a long rap sheet there, but the government does think it's significant that, as Your Honor noted and as we noted in our memorandum, this is an instance in which, just like the prior trespass, the defendant knew that he was not supposed to be there, and although there are many more alarming circumstances surrounding January 6, it is a pattern of knowing that you're not allowed to be somewhere -- and just to recall those facts.  It's not just that Mr. Wren's ex-wife told him that day.  He had been criminally trespassed, I believe, in 2010.  So when she told him on the phone not only do I not want you to be here but it would be a criminal violation of trespass for you to be here and he came anyway -- that was in 2013 -- and was arrested, there was an officer waiting for him there.

I would also point the Court to the statements that Mr. Wren made after the trial.  We've covered some of the statements he made during the trial which certainly reflect -- and during the investigation -- the idea that he does not accept responsibility for his crimes that day.  And I will pull it up

1    if and when we're able to.  Okay.

2         So let me go to that first.  So these are statements that

3    the FBI recovered that Mr. Wren posted on a GiveSendGo.  This is

4    covered in the --

5              MR. PALLAS:  Judge, I'm going to object to that.

6              THE COURT:  Basis?

7              MR. PALLAS:  There's no proof that Mr. Wren wrote

8    that.  In fact, he did not.

9              THE COURT:  Well, you can argue that, but I'll --

10             MR. PALLAS:  Okay.

11             MS. SHEETS:  So just drawing the Court's attention to

12   a few of these statements, and it's here in full if you would

13   like to review it.  I can give the Court a moment.  But at the

14   end of the first paragraph, "I never went inside the Capitol nor

15   did I physically touch in any manner an officer or anything to

16   that nature," which is against the evidence that was presented.

17        Further down, he says, "On January 6, I witnessed things by

18   the police that horrified me.  The same police that are supposed

19   to protect us were brutally beating and killing our fellow

20   patriots."

21        These are very harmful and dangerous misstatements of what

22   was happening that day, to put it lightly.  He goes on to

23   describe the brutality of their actions, that "four of our

24   fellow patriots were killed unnecessarily."

25        And while the government does not dispute that yes, it's a

tragedy that the violence that happened that day occurred, these

statements, and I could go on, fully seem to show Mr. Wren,

rather than accepting responsibility, you know, washing his

hands and seeing himself as a hero of sorts, a patriot.

He also says on a little bit of a different note, at the

first sentence of the second paragraph, "During my trial, it was

proven that the FBI agent lied to get my arrest warrant."

Again, this is a dangerous misstatement of truth.  Frankly,

the government's not sure what the defendant would be referring

to here.  But all of these statements, again post-trial on this

GiveSendGo account asking --

THE COURT:  If you want to talk, you've got to take it

outside.

MS. SHEETS:  -- asking for the public to raise a

substantial amount of money, which it did not appear at the time

that this was pulled on October -- or earlier this month had

been raised.

But the point of all this is, what we are seeing here

confirms what we already heard from Mr. Wren during the trial.

He testified that he -- let me rephrase.

He did not accept responsibility for his actions, and it

seems that even after convicted by a jury of his peers, given

these statements made post-trial, he continues to make

misstatements that serve his story of how he believes he should

be portrayed and his actions should be portrayed that day, and

he does not accept responsibility.

Just going back to the need for the sentence to reflect the seriousness of the offense, again, I won't belabor it, but as Your Honor has pointed out already in this sentencing, this is a selfie taken by Mr. Wren, recovered from his phone.  Now, this was after Mr. Smith had entered the tunnel and after Mr. Wren had been hovering outside of the tunnel and could see inside the violence that was happening.

If you will recall, Mr. Smith came out of the tunnel. Mr. Wren testified that Mr. Smith's face was red and that it appeared he had been sprayed by something.  He at that point did not leave, but he and Mr. Smith climbed up to the Upper West Terrace, which is where the conduct occurred of the pushing of the shield.

Your Honor will recall that when we started the trial, we had this photo, but what we didn't have is the videos.  And I will play those briefly.  We saw them at trial and how they contradicted Mr. Wren's statements, and they contradict the statements that he has made post-trial about police brutality and painting what he and others were doing there as heroic.

(Video played.)

THE COURT:  I'm going to play it one more time with sound, if it works.

(Video played.)

MS. SHEETS:  Which it does not appear that it is.  I'm

1    just going to play one more video that's another angle.

2          (Video played.)

3          MS. SHEETS:  Shoot.  The sound does not work, but Your

4    Honor will recall how loud it was.  You can clearly see here

5    Mr. Wren pushing on that clearly marked police shield.  And you

6    heard Corporal Heaney's testimony during the trial that he

7    remembered this individual in particular -- Corporal Heaney was

8    one of the officers from P.G. County in that line -- and that

9    they were at first able to start moving people off of the Upper

10   West Terrace so that they could restart the certification.  But

11   in particular, when this individual pushed on the police shield

12   for an extended period of time, I think we counted up to 20

13   seconds during the trial, that that is when the violent

14   stand-off on the Upper West Terrace really started in earnest.

15         So the need for the sentence to reflect the seriousness of

16   the crime, the last thing I will say on that is, given the

17   recalculation that Your Honor has ruled upon, we believe that a

18   midpoint is still what should be imposed, which would be 24

19   months.

20         In particular, the need for the sentence to reflect a

21   respect for the law, given that this defendant in particular has

22   painted his actions as lawful, as something to be lauded, that

23   he did what any upstanding American, patriot would do.  There

24   were some sentences, statements that I won't go through in the

25   defendant's sentencing memorandum that seemed to double down on

1    that principle.

2         And that leads into the last factor, which is the need for

3    the sentence to adequately deter other individuals, as well as

4    this individual.  And I would focus in particular on general

5    deterrence, which is not always what is most focused on.  But

6    statements during his trial, that he was arrested for something

7    he didn't believe he should be arrested for, that is a bold

8    statement that he made during the trial, and it is clearly,

9    through his post-trial statements, going to be the narrative

10   going forward.

11        The need for general deterrence, as it ties into how this

12   story and sentence is going to reflect what the Court thinks of

13   the believability of the story, that the defendant was a hero,

14   that the defendant was just defending his ideals, you know, just

15   to state it obviously, it's very important for the future of our

16   country that something like January 6 does not happen again.

17        And we ask that the Court, for all of those reasons set out

18   in 3553, find the -- or excuse me, sentence the defendant to 24

19   months.

20             THE COURT:  Defense.

21        Let me ask the court reporter, are you fine?

22             COURT REPORTER:  Yes.  Thank you.

23             MR. PALLAS:  Judge, I'll be brief as well, because

24   Your Honor did attentively watch the trial.

25        But I think for sure the fact that he was convicted of only

1    three of seven charges shows that there was some overstepping of

2    the government or exaggeration of the charges.  I don't think he

3    was guilty.  And I think he did better going to trial, because

4    rather than having a PSI and we argue over what happened, Your

5    Honor saw, Your Honor saw that there was no assault.

6         The problem in this case was the beginning.  He was charged

7    with a -- he was an AFO, AFO 217.  And they had that nasty

8    picture of him with his hands up there, and that's what started

9    it.  And he was like holy cow.  We've all been to a wedding or a

10   party and someone takes a picture of us and we're yawning or our

11   eyes are closed.  It was a snapshot that really wasn't

12   accurately showing what happened.

13        And because of that, he became a wanted man, or wanted by

14   the government, and thankfully, he went to trial to show that

15   the evidence was not all that.  He never physically touched

16   someone.  He touched the shield.  He never touched a person.  He

17   never tried to remove a shield and touch that person.

18        Four patriots were killed or four people were killed, four

19   protestors were killed on January 6.  One of them was an unarmed

20   female that was shot to death by the police.  That happened.

21             THE COURT:  Yeah, shot coming through a broken window

22   that was in close proximity to where congressional members were

23   located, by individuals who obviously wanted to do harm to them.

24             MR. PALLAS:  Shot to death by -- an unarmed female was

25   shot to death by the police.

1          THE COURT:  Right, with a large number of people

2     trying to, obviously, gain entry into the Capitol for the

3     purpose of harming, probably killing congressional members and

4     the vice president if they had had the opportunity to do.

5          MR. PALLAS:  Well, I mean, I'm just stating what the

6     facts are, Judge.  An unarmed female was shot to death --

7          THE COURT:  I think they're very lucky the police

8     showed the restraint that they did.

9          MR. PALLAS:  I think some did.  I certainly think some

10    did.  And I think some protestors did as well.

11        I think he did when he left the tunnel, when he saw -- when

12    people were urging all men go in, all men go in, and he was

13    there and looked and saw what was going on and left.

14         THE COURT:  But went to another location.

15         MR. PALLAS:  He followed his cousin up to the Upper

16    West Terrace, Judge.

17         THE COURT:  He's a grown man.  You can't convince me

18    that he just was being led by his nose by his cousin and he just

19    did what his cousin told him to do.

20         MR. PALLAS:  Okay.  So he went up to the Upper West

21    Terrace and put his hands on a shield for 18 seconds.  And for

22    that -- look, Judge.  That act is consequential only because it

23    happened on January 6.  If I'm walking out of a restaurant and I

24    get in an argument with an off-duty officer and I push him, I'm

25    going to get probation or court costs.  But because it was

1   January 6 and because his hands were for 18 seconds on a shield,

2   he's here, he's here.

3       Judge --

4       THE COURT:  You're not suggesting that that was not a

5   significant event in the history of this country, something that

6   hopefully will not be repeated?  Because that's what happens in

7   banana republics when democracies die.

8       MR. PALLAS:  Well, there have been more significant

9   events in the history of our country, Judge.  In the Civil War,

10  we fought, our country fought, there was 6,000 Americans, 6,000

11  Americans that were killed.  And what happened after the war is

12  something that the courts in this district should be aware of.

13  What happened to them?  They had 2,000 Confederate soldiers, and

14  what did they do?  They pardoned them as a gesture of peace.

15  Because, you know, the victor doesn't always relish the

16  vanquished, you know.  There should be some mercy to the people

17  that are in that situation.

18      And a gesture -- I told the jury that, you know, this

19  country is divided.  And Your Honor may have objected to it or

20  the government objected to it, but it's true.  It's true.

21      At some point -- I'm not the person to send the message,

22  apparently, but someone should.  Someone should send a message

23  that this country has to stop pointing its fingers at each other

24  and stop fighting.

25      I love Washington, D.C.  I like the restaurants.  I love --

1    I come here.  I enjoy it.  But then I see the constant bickering

2    and the constant fighting, and I'm like, I couldn't live here.

3    I really can't.

4            THE COURT:  I'd rather live here than live where you

5    live.

6            MR. PALLAS:  Well, you're welcome to come down any

7    time, Judge.

8            THE COURT:  I don't want to live in Florida.

9            MR. PALLAS:  You might like the winters.

10           THE COURT:  I don't think -- the weather may be nice,

11   but the way things are going on down there, I'm not sure I'd

12   want to live there better than the D.C. area.

13           MR. PALLAS:  I don't know.  I like it.  But, you know,

14   you guys -- there's a lot of talented lawyers here.  There's a

15   lot of very smart judges here.  It's a very -- I love handling

16   cases here.  But you can't look at these January 6 defendants as

17   uneducated peasants that are coming here to your district and

18   that -- and are protesting in favor of someone that you all

19   hate.

20       I mean, come on.  You all hate Donald Trump.  That's

21   obvious.  96 percent of the District of Columbia voted against

22   him.

23           THE COURT:  That's not hate.

24           MR. PALLAS:  Okay.  Well, they don't like him.

25           THE COURT:  Well, it's not necessarily hate.

1           MR. PALLAS:  What is it, Judge?

2           THE COURT:  You're going to denigrate the people of

3    the District of Columbia because they voted?  What about all the

4    people in other locations who voted for Donald Trump?  Are you

5    saying that they all hate Biden, too?

6           MR. PALLAS:  No, but many do.  But they're divided.

7    Here, there's a lot of people that do not like Donald Trump in

8    this district.  I think that's a fair statement.

9           THE COURT:  There's a difference between hate and

10   don't like.  I don't think people necessarily hate him.

11          MR. PALLAS:  Judge, you know, there's a point -- he

12   has a tenth grade education, and notwithstanding that, he

13   started working at 17, and he works now, Judge, for the same

14   company for 17 years, and he's gotten to the point -- I don't

15   know if you remember the testimony, but they kept on looking for

16   him at his house, and he was never there.  Then the one day they

17   go to his work, through the swamps and through the dirt, they

18   find him all dirty and all swampy on a big machine.

19        He works in my community where my kids live, where my

20   family lives, cleaning the water there so we can drink clean

21   water.  His boss told me and told Probation he is the best

22   employee they have.

23        And you're going to take someone out of that environment,

24   someone that is a productive member of our community, you're

25   going to take him out of there, and you're going to put him in

1    jail?  That doesn't make any sense.

2          His mom is here.  His mom has Alzheimer's.  She can't

3    really address Your Honor.  All these people are his family.

4    His aunt is here and wants to speak on behalf of his mother who

5    can't speak.

6          But he supports his mom with a job that he works.  He works

7    a piece of machinery that digs 90 feet down.  It's a custom-made

8    machinery that weighs 240,000 pounds, and he's the only one that

9    knows how to work it.

10         He goes all over the country cleaning water so -- and it

11   doesn't matter if you hate Donald Trump, you like Donald Trump,

12   you hate Joe Biden, you like Joe Biden, you're black, you're

13   white, you're gay, you're straight.  Clean water, clean dirt

14   benefits us all.

15         And despite his tenth grade education, Judge, he's a

16   productive, productive member of the community, probably the

17   most productive member of the community that was on Capitol

18   grounds that day.

19         Judge, you know, he wrote that thing -- he didn't write

20   that thing.  His niece did.  He's not a writer.  Believe me.

21   And it says that the FBI agent lied.  She did.  That came out in

22   trial.  She said in her grand jury testimony that Donnie Wren

23   pushed the police officer and that police officer fell to the

24   ground.  That did not happen.  The agent, Agent Ball, when she

25   was confronted with it, admitted that did not happen.  She

1    stated that to the grand jury under oath.

2         By the way, that GiveSendGo, that GiveSendGo raised zero

3    dollars.

4         Judge, I think if you look at the man and you look at the

5    context, I mean, of course, January 6 was a serious situation.

6    There were many people that were out of control.  There's no

7    question about that.  But the level of culpability of this

8    defendant juxtaposed against his value to the community, if you

9    remove him from his job, that's a big hole in his employment and

10   a problem for the mom, you know, to be supported.  It's a big,

11   big decision and a big problem, and I urge Your Honor to show

12   the mercy that I think Your Honor is capable of showing.

13        And I ask that you institute either home confinement or a

14   period of probation -- I suggested 36 months -- with home

15   confinement.  He could have a bracelet.  But he's not going to

16   be anywhere other than in the swamps and in the dirt working on

17   his rig.

18        He went back there after the trial, because Your Honor

19   graciously allowed him to remain free, and he went back to work,

20   and his boss is calling wanting him back to work.

21        So my recommendation to Your Honor is 36 months' probation

22   and whatever conditions Your Honor wants to impose.

23             THE COURT:  Anyone else you want me to hear from?

24   Counsel, anyone else you want me to hear from?

25             MR. PALLAS:  Does the aunt want to say something?

1        Very quickly, Judge.  I told them that we mostly do it on

2    paper, but they did want to say briefly something.

3            PATRICIA WOODRUFF:  Thank you, Your Honor.

4        Wait just a minute.  I might not be able to do it.

5            MR. PALLAS:  Introduce yourself first.

6            PATRICIA WOODRUFF:  I'm Patricia Woodruff.  I'm

7    Donnie's aunt and Tommy Smith's aunt also.

8        I just want to tell you, Your Honor.  I know a lot has

9    happened, a lot has taken place, but my nephews are good

10   nephews.  They've raised their children, you know, very well,

11   and they've been hard workers all their life.  And, you know, I

12   know they've made mistakes throughout the years and stuff like

13   that.

14       But a little over two years ago, Lonnie lost -- I mean,

15   Donnie lost his dad to cancer, and he's been the sole supporter

16   of his mom and his dad before his dad passed away because he was

17   sick for a while with the cancer.  And he's been so supportive

18   for his entire family, you know.

19       And I just want to let you know that, you know, yes, it was

20   a mistake of whatever they did on January the 6th.  It was a

21   mistake to come to Washington, D.C.  But he did not write that

22   GiveSendGo or whatever that thing was.  He was not the one that

23   wrote that, you know, at all.  That was not his writing.  Those

24   were not his words whatsoever in that.  That was done, I guess,

25   after the trial or something like that.  He had nothing to do

with that.  So that's not his words that was written that day.

I mean, he has been worried to death.  He's been, you know -- his health has -- he's having a lot of stomach problems because of his nerves and stuff because of what has happened on January the 6th, you know.  And all he does is work all the time and just to be able to take care of his mom, to be able to pay his attorneys to represent him throughout this, this trial and all, you know, that has been very expensive, you know.

And he's just -- I just want you to know that, you know, his mom -- I don't know what his mom will do without him, because her -- she's got dementia.  She's got vascular dementia due to her heart.  She had a heart attack here like two months ago and a pretty bad heart attack.  She's got to have some more surgeries done because that's stopping the blood flow to her brain, which is causing the dementia, you know.

So I mean, we really need him, because he helps so much with his mom and supports her and bought her her place to live where she lives at, you know.

Thank you for hearing from us, Your Honor.

THE COURT:  Thank you.

Anybody else?

MR. PALLAS:  Just the defendant, Mr. Wren, wanted to say a few sentences.

THE COURT:  Very well.

THE DEFENDANT:  Thank you, Your Honor.  Donnie Wren.

1    I am very remorseful for that day.  It was a sad day in our

2  history, and it's just something I can't take back.  I'm sorry.

3    There are a few things wanted to say about the trespassing

4  on my ex-wife.  That was my house, and I was dropping my kids

5  off after a ten-hour round trip.  She wouldn't meet me halfway.

6  So I came all the way.  That's why I went.  I knew better.  I

7  shouldn't have done that either.  I've lived my life where I

8  went to jail, got all that taken care of.

9    It will be Your Honor's decision today.  I do beg of your

10  mercy, but I am ready to accept your charges, whatever you give

11  me.

12    THE COURT:  One thing that concerns me, Mr. Wren,

13  significantly are -- was that funding letter that was put out to

14  try and collect money on your behalf.  Your lawyer and your aunt

15  said that you didn't write that.

16    THE DEFENDANT:  No, sir, I didn't.

17    THE COURT:  But it's kind of troubling to me that what

18  is in it is in it if you didn't write it.  It seems to me

19  somebody had to have been told what was said that ended up in

20  that letter or in that funding letter.

21    THE DEFENDANT:  Your Honor, I never even read it.  I

22  never even downloaded it on my phone.  I know who wrote it.  I

23  do.  And I was told she was going to do it for me to help me pay

24  the rest of my lawyers.

25    THE COURT:  Where did she get that stuff from, then?

1          THE DEFENDANT:  I'm sorry, sir?

2          THE COURT:  Where did she get that information about

3     allegedly four people being killed that day?  I don't even -- I

4     know of one woman who was shot, but I don't know the other

5     individuals who were allegedly patriots who were killed.  There

6     were a number of police officers who died.

7          THE DEFENDANT:  It was my cousin that wrote the letter

8     that started the GiveSendGo for me.  She's the one that wrote

9     it.  She was here in court when we were having court, but she

10    wasn't here through the whole thing.  She had to go back home.

11      I guess you hear a lot of talk about January 6 from all

12    different people and all different news.  You get information

13    from everywhere.

14         THE COURT:  Mr. Wren, you know, when you saw what was

15    happening in that tunnel, and there was a lot of violence in

16    that tunnel, I would have thought, if it were me and I saw all

17    that taking place and I had only come here to peacefully

18    protest, which you have a right to do as an American, that I

19    would have said I'm getting out of here, and I would have left.

20      But you didn't.  You went up to another level and had to

21    have seen the police try to move people off of that level.  And

22    rather than you walking away then, you went up and confronted

23    the cops.

24         THE DEFENDANT:  Your Honor --

25         THE COURT:  Yet, you say you like the cops.

1          THE DEFENDANT:  I did --

2          THE COURT:  I mean, four police officers, I believe it

3     was four, committed suicide.  One had a heart attack because of

4     the trauma of what they experienced.

5       Mr. Pallas, you can shake your head as much as you want,

6     but there were a number of officers who died, and their families

7     say it was because of the trauma that they experienced.

8          MR. PALLAS:  That's not true, Judge.  That's not true.

9          THE COURT:  Well, you can shake your head all you

10    want.

11         MR. PALLAS:  It's not true.

12         THE COURT:  You can say that.

13         MR. PALLAS:  I've researched it; I've researched it.

14         THE COURT:  Well, I've heard what the family had to

15    say also.

16       Go ahead, sir.

17         THE DEFENDANT:  I am deeply sorry for what the

18    officers went through that day.  It was a sad day in our

19    history.  A lot of people -- like I said on the stand that day,

20    yea, there was a line of police up there.  I walked past them

21    many times.  The instant we clashed, it was just a crowd of

22    people.  I didn't see them pushing everybody back.  So yes, I

23    just ran into them.  I wasn't there to hurt nobody.  I wasn't

24    there to start no chaos or mayhem.  And when I realized what was

25    going on, yes, sir, I did, I left.  I left.

1          I didn't physically or mentally hurt nobody.

2          THE COURT:  Well, Mr. Wren, having to sentence people

3    is one of the hardest things that we as judges have to do, but

4    it's something that has to be done.

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  And regardless of what anybody thinks,

7    what happened on January 6 of 2021 is something that should not

8    have happened in America.  It's an embarrassment in the world

9    community that that happened in our country.  It's what you

10   would think would happen in some third world banana republic.

11   The electoral process is the foundation of the American system

12   of government.

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  And historically, you know, I'm sure that

15   one party or the other who lost the election didn't like it, but

16   they accepted that that's just the way that a democracy

17   operates.  And what happened that day is what happens as a

18   beginning of what results in the destruction of democracy.  And

19   that's a scary proposition, because I think the United States

20   holds a special place in the world community.  We can't maintain

21   that status when that type of event occurs.

22         I go all over the world teaching, and I hear from countries

23   and people who say, you know, how can this happen in America.

24         And it is -- like your lawyer said, there's a real divide

25   in America, which is very troubling.  And what happened on that

1    day just contributed to that divide that exists.  And I don't

2    know how we solve it, but I know what happened that day is not

3    the way to solve it.  That only makes it worse.

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  And the reality is that you weren't the

6    worst of the worst, but you contributed to what took place that

7    day.  It was the mob mentality that resulted in what happened

8    that day occurring.  There's nothing in your past that would

9    show that you're a violent person, but nonetheless, your

10   presence did contribute to the mob mentality that resulted that

11   day.

12       And as I said, even though you didn't enter the tunnel, you

13   saw -- had to have seen what was taking place in that tunnel:  A

14   violent incursion between a group of individuals and the police.

15       Like I say, that should have been a sufficient event to say

16   I'm getting out of here and to turn and walk away and go back to

17   where you came from.

18       But you didn't do that.  You went to another level.  And

19   you had to have -- because it clearly showed you a distance away

20   from the police.  They didn't come to you.  You went to them.

21   And they were trying to remove people from that level of the

22   Capitol grounds.  And rather than you leaving, you went up and

23   tried to stop them from moving forward.

24       That's something that can't be tolerated.  It can't.  And

25   to give a slap on the wrist and to say it's fine, just go home,

1    you know, in peace and sin no more just sends the wrong message.

2         Because unfortunately, the same rhetoric that created what

3    took place that day is still taking place now.  And my fear is

4    that we will have a repeat of what occurred if people feel that

5    they can do what happened that day and there are no

6    consequences.  That just can't be.  A message has to be sent not

7    only to you but to others that if you're going to do what you

8    did that day, there have to be consequences.  And maybe that

9    will cause people to think twice before they do it again.

10        The guidelines are the guidelines.  And generally, I think

11   it's appropriate for a court to take into account, we have to,

12   what the guidelines are, because at least it sets a benchmark of

13   where we should start in assessing what a sentence is, because I

14   think that the guidelines at least give us some idea of what an

15   appropriate sentence should be so that I'm not sentencing and

16   other judges are not sentencing very differently for what others

17   do.

18        And I think that's an important thing for us to consider.

19   And your lawyer is asking me to give you something way below

20   what the guidelines provide for that I reduce those guidelines

21   to be based upon what my rulings have been today.  I just can't

22   go to where they want me to go.

23        However, considering the fact that you have worked hard all

24   of your life, your employer says that you're a good employer,

25   there's evidence indicating that you appear to be a good father,

1    I take those factors into account.  While you've got a couple

2    prior convictions, they aren't the most serious convictions.

3    And I obviously will take that into account in deciding what the

4    appropriate sentence is.

5         But I cannot give a probationary sentence, because I think

6    that just sends the wrong message to society that this type of

7    behavior is going to be acceptable.

8         So I will conclude that a sentence of one year in prison is

9    an appropriate sentence to impose in this case, which I will

10   impose.

11            THE DEFENDANT:  Yes, sir.

12            THE COURT:  I will also place you on supervised

13   release for a period of -- I'm sorry.  I will sentence you to 46

14   months -- I'm sorry, to one year in prison on each of the

15   offenses, to run concurrent with each other.

16        In reference to the supervised release, I will sentence you

17   to two years of supervised release, and I will also impose a

18   fine of $2,500 in restitution, although there's no -- well,

19   there's no indication that you did any damage.  So I'm not going

20   to impose a restitution obligation.  The law does require that

21   you pay $225 in court costs, which I will impose.

22        As a condition of your supervision, once you finish your

23   prison sentence, I will require that you not be re-arrested for

24   any reason whatsoever, whether it be a violation of federal,

25   state, or local law; also that you not possess any type of

1    illegal substances and that you not use any type of illegal

2    substances.

3        I will require that within 15 days of your release from

4    prison that you submit to at least one drug test and be tested

5    periodically by the Probation Department at the Probation

6    Department's discretion.

7        You are required to provide a sample of your DNA, so if

8    you're involved in further crime that can be used to identify

9    you.

10       I also will require that you comply with the other

11   conditions:  One, that you pay the fine of $2,500 to the Court.

12   Also, that has to be paid to the Clerk of the Court here for

13   deposit into the general fund of the United States.

14       Also, that you pay the court costs as a condition of your

15   supervised release if it hasn't already been paid by the time

16   you're released from prison.

17       Also, until your financial obligations to the Court are

18   paid, you have to provide any financial disclosure information

19   required by the Probation Department.

20       Also, that you not create any further financial obligations

21   or debt obligations until your obligations are paid.

22       Also, that you -- within 30 days of your release, that

23   there will be a hearing held before me to make sure you're

24   compliant with the conditions of your release.  If you are not

25   in the District of Columbia, I will permit that hearing to be

1    conducted remotely by telephone or by Zoom.  However, if you're

2    not in compliance, I will require that you be here on that day.

3        There are general conditions of supervision that you have

4    to comply with.  You should review those with the Probation

5    Department to make sure you understand what those obligations

6    are and also with your lawyer.

7        You do have 14 days from today's date to appeal your

8    conviction and your sentence to the Court of Appeals.  If you

9    cannot afford to pay for a lawyer to represent you or if you

10   cannot afford to pay for the papers to be filed with that court,

11   those expenses will be paid free of charge by the government.

12       Probation, anything else?

13           PROBATION OFFICER:  Your Honor, we would ask, is the

14   Court allowing Mr. Wren to voluntarily surrender?

15           THE COURT:  Yes, I will permit him to voluntarily

16   submit to the Bureau of Prisons.

17       Mr. Wren, I will release you until you get notification

18   from the Federal Bureau of Prisons that you are to report, and

19   once you get that notification, you must report as ordered.  If

20   you don't, a bench warrant will be issued for your arrest.

21           THE DEFENDANT:  Yes, sir.  Thank you, Your Honor.

22           THE COURT:  Government, anything else?

23           MS. SHEETS:  Just very briefly, Your Honor.

24       If Your Honor would state for the record, if you're so

25   inclined, that even if you calculated a different guideline

1   range or a lower guideline range, that you would still find the

2   sentence of 12 months to being proper based on the 3553 factors.

3            THE COURT:  Yes.  That was the predicate for my

4   decision.  I conclude that a sentence of 12 months, even though

5   it's below the guidelines, would be an appropriate sentence

6   based upon the factors I indicated.

7            MS. SHEETS:  Yes, Your Honor.  Thank you.

8            THE COURT:  I will take a ten-minute recess.

9            COURTROOM DEPUTY:  Your Honor, I have a quick

10  clarifying question to ask.

11           THE COURT:  Yes.

12           COURTROOM DEPUTY:  For the supervised release, is it

13  two years concurrent as to each count?

14           THE COURT:  Yes.

15           COURTROOM DEPUTY:  Okay.  Thank you.

16      And also, the government needs to dismiss the indictment

17  in -- the first superseding indictment.

18           MS. SHEETS:  Yes, Your Honor.  The government moves to

19  dismiss the remaining counts.

20           THE COURT:  Are there counts to dismiss?

21           MR. PALLAS:  No.  He was acquitted.

22           COURTROOM DEPUTY:  The first indictment needs to be

23  dismissed.

24           THE COURT:  Very well.  The indictment obviously he

25  was convicted of remains in force, but if there are other

```
 1    indictments that were superseded, then those would be dismissed.

 2              MR. PALLAS:  Judge, I had one thing.

 3         I would ask Your Honor for a judicial recommendation for a

 4    prison near Mississippi.

 5              THE COURT:  Very well.  I will recommend he be

 6    permitted to serve his sentence as close to his residence --

 7    where in Mississippi?  Any particular location?

 8              MR. PALLAS:  Was it Yazoo City?

 9              THE COURT:  A facility as close to Yazoo City as

10    possible.

11              MR. PALLAS:  Judge, something is bothering me.  I

12    understand you gave a sentence of one year.  I believe that if

13    it's a sentence of one year and one day, he gets good time --

14              THE COURT:  Very well.  One year and one day, yes.

15              MR. PALLAS:  I don't know how it works on the

16    misdemeanor.

17              THE COURT:  Very well.

18              MR. PALLAS:  Thank you, Judge.

19         (Proceedings adjourned at 3:21 p.m.)

20

21

22

23

24

25
```

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick                    December 27, 2023

9    SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25